867 F.2d 654
 276 U.S.App.D.C. 38, 57 USLW 2488, 16
Media L. Rep. 1225
 SYRACUSE PEACE COUNCIL, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Meredith Corporation, CBS, Inc., Radio-Television News
Directors Association, American Newspaper
Publishers Association, Democratic
National Committee, National
Broadcasting Co.,
Intervenors.
Henry GELLER and Donna Lampert, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
Meredith Corporation, National Association of Broadcasters,
National Broadcasting Company, Inc., CBS, Inc.,
Radio-Television News Directors Association, American
Newspaper Publishers Association, Freedom of Expression
Foundation, Reporters Committee for Freedom of the Press, Intervenors.
 Nos. 87-1516, 87-1544.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 13, 1988.
Decided Feb. 10, 1989.
As Amended Feb. 10, 1989.
 
 Henry Geller, pro se, with whom Donna Lampert, pro se, was on the brief for petitioners Geller and Lampert.
 Andrew Jay Schwartzman, Washington, D.C., with whom David W. Danner was on the brief, for petitioner Syracuse Peace Council. Earle K. Moore, New York City, also entered an appearance for petitioner Syracuse Peace Council, et al.
 Angela J. Campbell, Washington, D.C., Yolanda Gallegos and Robert T. Perry were on the brief for petitioner Office of Communication of the United Church of Christ. Michael Botein, Washington, D.C., also entered an appearance for petitioner Office of Communication of the United Church of Christ.
 Diane S. Killory, Gen. Counsel, F.C.C., with whom Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Kenneth G. Starling, Deputy Asst. Atty. Gen., C. Grey Pash, Jr., Sue Ann Preskill, Richard J. Bozzelli, Counsel, F.C.C., and John J. Powers, III, Atty. Dept. of Justice, Washington, D.C., were on the brief for respondents. Robert J. Wiggers, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.
 
 
 1
 Timothy B. Dyk, with whom Adrienne Masters, J. Laurent Scharff, W. Terry Maguire, Washington, D.C., Bridgette M. Rouson, Reston, Va., David H. Hunsaker, Steven A. Bookshester, Jane E. Kirtley and Henry L. Baumann were on the brief, for intervenors CBS, Inc. James M. Smith, John B. Wyss, Richard E. Wiley and William B. Baker, Washington, D.C., also entered appearances for intervenors, CBS, Inc.
 
 
 2
 Floyd Abrams, with whom Dean Ringel, New York City, Michael H. Bader, John M. Pelkey, Melodie A. Virtue, Washington, D.C., and Thomas G. Fisher were on the brief, for intervenor Meredith Corp.
 
 
 3
 Howard Monderer, Molly Pauker, Washington, D.C., and Corydon B. Dunham, New York City, were on the brief for intervenor Nat. Broadcasting Co., Inc.
 
 
 4
 Charles D. Ferris, Bruce D. Sokler and James A. Kirkland, Washington, D.C., were on the brief for intervenors Democratic Nat. Committee.
 
 
 5
 Phillip Heymann, Yoland Gallegos, Don Simon and Mark E. Chopko, Washington, D.C., were on the brief for amici curiae, Common Cause, et al., urging reversal. Phillip H. Harris, Washington, D.C., also entered an appearance for amici curiae, Common Cause, et al.
 
 
 6
 Philip H. Hecht, Washington, D.C., was on the brief for amicus curiae, People for the American Way, urging reversal. Jan G. Levine also entered an appearance for amicus curiae, People for the American Way.
 
 
 7
 David W. Danner, Washington, D.C., entered an appearance for amicus curiae, Safe Energy Communications Council, et al.
 
 
 8
 Before WALD, Chief Judge, and STARR and WILLIAMS, Circuit Judges.
 
 
 9
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 
 10
 Opinion concurring in part and dissenting in part filed by Chief Judge WALD.
 
 
 11
 Concurring opinion filed by Circuit Judge STARR.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 12
 Under the "fairness doctrine," the Federal Communications Commission has, as its 1985 Fairness Report explains, required broadcast media licensees (1) "to provide coverage of vitally important controversial issues of interest in the community served by the licensees" and (2) "to provide a reasonable opportunity for the presentation of contrasting viewpoints on such issues." Report Concerning General Fairness Doctrine Obligations of Broadcast Licensees, 102 F.C.C.2d 143, 146 (1985). In adjudication of a complaint against Meredith Corporation, licensee of station WTVH in Syracuse, New York, the Commission concluded that the doctrine did not serve the public interest and was unconstitutional. Accordingly it refused to enforce the doctrine against Meredith. Although the Commission somewhat entangled its public interest and constitutional findings, we find that the Commission's public interest determination was an independent basis for its decision and was supported by the record. We uphold that determination without reaching the constitutional issue.
 
 I.
 
 13
 In the summer of 1982 Meredith ran a series of advertisements over WTVH arguing that the Nine Mile II nuclear power plant was a "sound investment for New York." Syracuse Peace Council complained to the Commission that Meredith had failed to give viewers conflicting perspectives on the plant and had thereby violated the second of the fairness doctrine's two requirements.
 
 
 14
 In its initial decision the Commission agreed with Syracuse that Meredith had failed to fulfill its obligations under the doctrine and demanded that the station within 20 days give notice of how it planned to meet those obligations. Syracuse Peace Council, 99 F.C.C.2d 1389, 1401 (1984).
 
 
 15
 Meredith filed a petition for reconsideration in which it argued that the fairness doctrine was unconstitutional. Meredith Reply to Opposition and Petition for Reconsideration and Supplement, April 12, 1985, at 11-41, Joint Appendix in Case No. 85-1723 at 261-91. Before ruling on Meredith's petition, the Commission completed its 1985 Fairness Report, the culmination of a separate inquiry into both the wisdom and constitutionality of the fairness doctrine. Inquiry into Alternatives to the General Fairness Obligations of Broadcast Licensees, 102 F.C.C.2d 143 (1985).
 
 
 16
 On the issue of whether the doctrine continued to promote the public interest, the 1985 Report said that the Commission was "firmly convinced that the fairness doctrine, as a matter of policy, disserves the public interest ..." 102 F.C.C.2d at 148. See also id. at 147 (similar); id. at 246 (language identical to that quoted). In reaching that conclusion the Commission invoked essentially the same grounds as it has in the present action--chiefly, that growth in the number of broadcast outlets reduced any need for the doctrine, that the doctrine often worked to dissuade broadcasters from presenting any treatment of controversial viewpoints, that it put the government in the doubtful position of evaluating program content, and that it created an opportunity for incumbents to abuse it for partisan purposes. Despite all this, it declined to eliminate the doctrine, expressing concern that it might be statutorily mandated. Id. at 148.
 
 
 17
 The 1985 Report also raised serious doubts about the continuing constitutionality of the fairness doctrine, but, saying that it was "the province of the federal judiciary--and not this Commission--to interpret the Constitution," 102 F.C.C.2d at 155, the Commission refused to make a constitutional ruling.
 
 
 18
 After issuing the 1985 Report, the FCC in due course considered Meredith's petition for reconsideration. In that context it again refused to address the constitutional issue--not on the ground that Meredith had raised the defense belatedly but solely on the theory that that issue should be left to Congress and the courts. It invoked its 1985 Report in support of this view. Syracuse Peace Council, 59 Rad.Reg.2d 179, 182 n. 4.
 
 
 19
 On appeal, this court reversed and remanded the case to the Commission. Meredith Corp. v. FCC, 809 F.2d 863 (D.C.Cir.1987). We noted the principle that regulatory agencies cannot invalidate an act of Congress, see Johnson v. Robison, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974), but said that an agency could not blind itself to a constitutional defense to a "self-generated" policy. 809 F.2d at 872. In the meantime, we observed, this court had in another decision found that the fairness doctrine was not mandated by statute. Telecommunications Research & Action Center v. FCC, 801 F.2d 501, reh'g en banc denied, 806 F.2d 1115 (D.C.Cir.1986) ("TRAC"),, cert. denied, --- U.S. ----, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987). See 809 F.2d at 873 n. 11. Thus on remand the Commission would have to resolve Meredith's constitutional defense, unless it determined in light of the 1985 Report that enforcement of the doctrine was contrary to the public interest. Id. at 874. We explicitly noted that the 1985 Report had concluded that indeed the doctrine no longer served the public interest standard of the Communications Act, see id. at 867, and that in the Report the Commission had "largely undermined the legitimacy of its own rule" and "eviscerate[d] the rationale" for the doctrine, id. at 873.
 
 
 20
 On remand, the Commission expanded the scope of the Meredith proceeding by soliciting comments from the public on the general questions whether "in light of the 1985 Fairness Report, enforcement of the fairness doctrine is constitutional and whether enforcement of the doctrine is contrary to the public interest." Syracuse Peace Council, 52 Fed.Reg. 2805, 2805 (Jan. 27, 1987). In its Memorandum Order and Opinion in Syracuse Peace Council, 2 F.C.C.Rcd. 5043 (1987), recon. denied, 3 F.C.C.2d 2035 (1988), the Commission ruled in favor of Meredith.
 
 
 21
 The FCC relied heavily on the conclusions drawn in the 1985 Fairness Report, and in fact incorporated that Report into the record and "reaffirm[ed] [its] findings and conclusions." See 2 F.C.C.Rcd. at 5066 n. 120. After reciting and endorsing the 1985 Fairness Report's conclusions, the Commission declared that "the fairness doctrine chills speech and is not narrowly tailored to achieve a substantial government interest." Id. at 5057. Consequently, the FCC concluded "under existing Supreme Court precedent, as set forth in Red Lion [Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) ] and its progeny, that the fairness doctrine contravenes the First Amendment and thereby disserves the public interest." Id.
 
 II.
 
 22
 At no time during the long and intricate proceedings in this case has any party suggested that the fairness doctrine is constitutionally compelled. Nor can it be claimed here, in view of this court's TRAC decision, that the doctrine is statutorily mandated.[1] Accordingly, the Commission has the authority to reject the doctrine if it concludes, without being arbitrary or capricious, that it no longer serves the public interest.
 
 
 23
 The Commission has slightly complicated the issue, however, by asserting that "the policy and constitutional considerations in this matter are inextricably intertwined." 2 F.C.C.Rcd. at 5046. If that were true, we could resolve the case only by addressing the constitutional issue.
 
 
 24
 But it is an elementary canon that American courts are not to "pass upon a constitutional question ... if there is also present some other ground upon which the case may be disposed of." See Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345-48, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). We applied the maxim in this litigation's prior appearance here, Meredith v. FCC, 809 F.2d at 870, and it is obviously no less compelling today. Further, if an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable. Salt River Project Agricultural Improvement and Power District v. United States, 762 F.2d 1053, 1060 n. 8 (D.C.Cir.1985); Communication Workers of America v. NLRB, 784 F.2d 847, 851 (7th Cir.1986) (citing Bowman Transportation v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286-87, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)).
 
 
 25
 Thus, if we are persuaded that the Commission would have found that the fairness doctrine did not serve the public interest even if it had foregone its ruminations on the constitutional issue, we must end our inquiry without reaching that issue. In fact, as we explain in part III, we have no doubt that even in the absence of constitutional problems the Commission would have reached the same outcome. We then turn in part IV to petitioners' objections to the Commission's policy decision, and in part V to issues relating to the Commission's withdrawal of the doctrine's "first prong," the requirement of coverage of controversial issues.
 
 III.
 
 26
 It is quite true that the Commission at the outset of its opinion here asserted that the constitutional and policy issues were "inextricably intertwined," 2 F.C.C.Rcd. at 5046, and at the end suggested that its policy conclusion was a mere consequence of its constitutional one, id. at 5057 ("the fairness doctrine contravenes the First Amendment and thereby disserves the public interest") (emphasis added). Those who would have us grasp the constitutional nettle call our attention to these references. See Intervenor Democratic National Committee Reply Brief at 4-6.
 
 
 27
 But the Commission's reasoning behind its "intertwining" assertion belies any inference that its policy judgment depends upon its constitutional view. It first set forth two overlapping points--that "First Amendment considerations are an integral component of the public interest standard" and that "the promotion of First Amendment values was the Commission's core policy objective in establishing and maintaining the doctrine." Id. at 5046. Insofar as these observations state that the same values are relevant to both constitutional and policy issues, they seem unexceptionable. Surely both decisions encompass the goals of stimulating fair, balanced, and diverse treatment of controversial issues (either by single stations or by the media in the aggregate); of minimizing any chilling effect that may flow from governmental requirements that one sort of presentation be matched by another; and of minimizing the risks of abuse and other adverse effects that may flow from having governmental officials sit in judgment on editorial decisions. But it plainly does not follow from this congruity of values that the Commission can make a policy finding against the fairness doctrine only by relying on constitutional grounds.
 
 
 28
 Quite the reverse. Indeed, the Commission's third argument for "intertwining," namely that in resolving broadcast-related constitutional issues courts "have found our perspective informative," see 2 F.C.C.Rcd. at 5046, pinpoints a clear distinction. In making a public interest judgment under the Communications Act,[2] the Commission is exercising both its congressionally-delegated power and its expertise; it clearly enjoys broad deference on issues of both fact and policy. See, e.g., FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981). Its role in constitutional judgments, while uncertain, is more limited. Its fact-findings have some force. Compare Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973) ("[I]n evaluating the First Amendment claims of respondents, we must afford great weight to the decisions of Congress and the experience of the Commission") with id. at 103, 93 S.Ct. at 2087 ("That is not to say we 'defer' to the judgment of the Congress and the Commission on a constitutional question, ... The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem"). As Judge Starr suggests, that force may depend on whether the agency has rejected or upheld the constitutional claim. See separate opinion of Judge Starr at 679 -680. But an ultimate constitutional decision on the doctrine necessarily melds raw facts with First Amendment value judgments, compare below at 683-684, and that melding process is for the courts.
 
 
 29
 Thus, under the legal framework within which the Commission and the courts operate, the overlap of values could not compel the Commission to rest its policy judgment on some supposition about the fairness doctrine's constitutional status.
 
 
 30
 Of course, if the Commission had written its opinion in purely constitutional terms, we would have no choice but to address the constitutional issue or--more likely--to remand to the Commission for it to re-arrange horse and cart. We doubt that Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1977), would bar this court from such a remand. Compare separate opinion of Judge Starr at 677-678. While Vermont Yankee makes clear that a reviewing court is not "to impose upon the agency its own notion of which procedures are 'best,' " id. at 549, 98 S.Ct. at 1214, we do not read it as saying that an agency can maneuver a court into a constitutional decision simply by vaulting over its statutory mandate to define and pursue the public interest. If courts may not resist such maneuvers, then an agency (unlike Congress) may put a hypothetical question to the courts: "If we were inclined to enforce the fairness doctrine (which we don't think we are, but we can't make up our minds), could we do so?"
 
 
 31
 Happily the Commission's opinion is not written in exclusively constitutional terms. First, its intermediate conclusions, if accepted, compel a finding that the doctrine fails to serve the public interest. Most notably, in summarizing its basis for concluding that the doctrine violated the Constitution even under Red Lion's view of the permissible scope of government control of broadcasters, it said:
 
 
 32
 In sum, the fairness doctrine in operation disserves both the public's right to diverse sources of information and the broadcaster's interest in free expression. Its chilling effect thwarts its intended purpose, and it results in excessive and unnecessary government intervention into the editorial processes of broadcast journalists.
 
 
 33
 2 F.C.C.Rcd. at 5052. It is hard to imagine any mental gymnastics by which the Commission, having delivered itself of such a condemnation, could go on to find the doctrine in the public interest.[3]
 
 
 34
 In addition, the Commission here adopted the findings of its 1985 Report wholesale. 2 F.C.C.Rcd. at 5066 n. 120. As noted above at 656, that Report never reached a conclusion on the constitutionality of the fairness doctrine, but focused explicitly and primarily on the Commission's view that the doctrine was detrimental to the public interest. The language of this finding could not have been firmer, and was made by the Commission at three points in the 1985 Fairness Report:
 
 
 35
 On the basis of the voluminous factual record compiled in this proceeding, our experience in administering the doctrine and our general expertise in broadcast regulation, we no longer believe that the fairness doctrine, as a matter of policy, serves the public interest.
 
 
 36
 102 F.C.C.2d at 147; see also id. at 148, 246. As we observed in Meredith, the 1985 Report "largely undermined the legitimacy" and "eviscerate[d] the rationale" for the doctrine. 809 F.2d at 873. The Commission's incorporation of the Report's reasoning here confirms our conclusion that the Commission would have made the same public interest finding if it had approached the issue free of "intertwining."[4]IV.
 
 
 37
 The FCC's decision that the fairness doctrine no longer serves the public interest is a policy judgment. There is no real dispute that fostering fair, balanced and diverse coverage of controversial issues is a good thing. Nor, so far as we can tell from the record or briefs, is there any question that discouraging any coverage at all, having government officials second-guess editorial judgments, or allowing incumbents an opportunity for abuse of power are things to be avoided, all other things being equal. The Commission's problem was to make predictive and normative judgments about the tendency of the fairness doctrine to produce each of these things, about how bad the bad effects were and how good the good ones, and ultimately about whether bad effects outweighed good.
 
 
 38
 In this situation, we owe great deference to the Commission's judgment. As the Supreme Court has stated,
 
 
 39
 [O]ur opinions have repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference.... The Commission's implementation of the public-interest standard, when based on a rational weighing of competing policies, is not to be set aside by the Court of Appeals, for "the weighing of policies under the 'public interest' standard is a task that Congress has delegated to the Commission in the first instance."
 
 
 40
 FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981) (quoting FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 810, 98 S.Ct. 2096, 2119, 56 L.Ed.2d 697 (1978)).
 
 
 41
 The Commission's factual judgments here are almost entirely predictive--statements about the overall effects of a policy on licensees and others. The Supreme Court has observed that "[I]n such cases complete factual support for the Commission's ultimate conclusions is not required since 'a forecast of the direction in which the future public interest lies necessarily involves deductions based on the expert knowledge of the agency.' " FCC v. WNCN Listeners Guild, 450 U.S. at 594-95, 101 S.Ct. at 1274 (internal quotations omitted). Although we do not suppose for a minute that experience without the fairness doctrine will quell dispute--the same problems of measuring the immeasurable will remain--we bear in mind Judge Leventhal's point that for resolution of dispute over "legislative" as opposed to "adjudicative" facts, "a month of experience will be worth a year of hearings." American Airlines, Inc. v. CAB, 359 F.2d 624, 633 (D.C.Cir.) (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).
 
 
 42
 Of course, an agency can act arbitrarily or capriciously in the exercise of a policy judgment, and we must assure ourselves that that did not happen here. The challengers' primary claims are that the supporting evidence was insufficient, that the Commission failed to consider the whole record or to consider alternative solutions adequately, and that its decision in the present case was an arbitrary decision from its 1985 decision to retain the doctrine.
 
 
 43
 Before addressing those specific attacks, we must describe two core findings of the 1985 Report--that the fairness doctrine often operated to chill broadcaster speech on controversial issues and that recent increases in broadcasting outlets undercut the need for the doctrine--on which the Commission relied heavily in the present decision. It found that the doctrine produced chilling effects by placing burdens on stations which chose to air numerous programs on controversial issues--including the fear of denial of license renewal due to fairness doctrine violations, the cost of defending fairness doctrine attacks and of providing free air time to opposing views if a fairness violation is found, and the reputational harm resulting from even a frivolous fairness challenge. While the FCC recognized that to a degree the first prong of the fairness doctrine offset this effect by requiring broadcasters to present some controversial issues, it nonetheless found that broadcasters were encouraged
 
 
 44
 to air only the minimal amount of controversial issue programming sufficient to comply with the first prong. By restricting the amount and type of controversial programming aired, a broadcaster minimizes the potentially substantial burdens associated with the second prong of the doctrine while remaining in compliance with the strict letter of its regulatory obligations. Therefore, despite the first prong obligation, in net effect the fairness doctrine often discourages the presentation of controversial issue programming.
 
 
 45
 102 F.C.C.2d at 161.
 
 
 46
 The 1985 Fairness Report also noted that paradoxically the chilling effect often fell on the expression of unorthodox or "fringe" views on controversial issues. Id. at 188. Since the doctrine compelled coverage only of "major" or "significant" opinions, the FCC claimed that in assessing fairness doctrine compliance, the Commission was called upon to evaluate broadcasters' decisions concerning the importance of given viewpoints. The Report expressed its fear that the fairness doctrine thus had the potential "to interject the government, even unintentionally, into the position of favoring one type of opinion over another." Id. at 190.
 
 
 47
 In assessing whether any need for the doctrine persisted, the 1985 Report found a dramatic increase in broadcasting outlets since the 1974 Fairness Report (48 F.C.C.2d 1). This expansion in broadcasting capacity was found to have been spread widely across American society. The FCC found that by 1984 96% of television households received five or more over-the-air (non-cable) television signals, compared with 83% in 1972. 102 F.C.C.2d at 205. Those receiving nine or more signals had tripled, from 21% of TV households in 1972 to 64% in 1984. Id. Of course some signals may for one reason or another be unable to function as serious alternative sources. But the new signals are plainly not trivial in the aggregate, as they have driven the networks' audience share down from 90% in 1982 to 76% in 1984. Id. at 206.
 
 
 48
 The Commission also found significant growth in radio outlets since the 1974 Fairness Report. The number of radio stations grew by 30% between 1974 and 1985. The subset of FM service increased during the same period by 60%, leading the FCC to proclaim that "there has also been a fundamental change in the structure of the radio market. Once predominantly an AM only service, radio is now composed of two very competitive services." Id. at 203. The Commission noted that radio expansion impacted smaller communities as well as larger urban areas; "the number of radio voices available in each local market has grown." Id.
 
 
 49
 Looking at substitute electronic media such as low power television, video cassette recorders, satellite master antenna systems, and so forth, the Commission found that the gains in radio and television accessibility and diversity actually understated the true development of broadcast media available to the viewing public. Id. at 208-17. The Report also noted that print media coverage of controversial issues offered Americans exposure to the type of information which the fairness doctrine was designed to foster.
 
 
 50
 We now turn to the specific objections to the Commission's conclusions.
 
 
 51
 Insufficiency of Evidence to Support FCC Position
 
 
 52
 Although there is some criticism of the 1985 Report's findings as to the growth of access to media signals, that commentary focuses largely on the point that some of the figures used by the Commission may exaggerate the significance of the alternative sources. But the Commission has included the figures on changes in audience shares, clearly reflecting its recognition that not all sources are equal. Some parties also assert that the FCC was overly concerned with aggregate or national figures at the expense of local data. Yet in looking at the Commission's finding concerning the number of households which receive five or more non-cable television signals--a whopping 96%--it seems to us that only a diminutive share of the population has been unaffected by the growth the Commission has recounted. Accordingly, we view these attacks as peripheral.
 
 
 53
 Several parties, however, have attacked the evidence of broadcaster chill and what they contend is the Commission's failure to respond adequately to the attacks. See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 46-51, 103 S.Ct. 2856, 2868-71, 77 L.Ed.2d 443 (1983). The United Church of Christ ("UCC") has taken the lead in this, relying in part on critical comments made in 1984 by two groups, Black Citizens for Fair Media ("BCFM") and Media Access Project/Telecommunications Research and Action Center ("MAP/TRAC").
 
 
 54
 In its present decision the Commission said that the record compiled for the 1985 Report contained "over 60 reported instances in which the fairness doctrine inhibited broadcasters' coverage of controversial issues." 2 F.C.C.Rcd. at 5050. It appears that numerically the main body of evidence comes from the comments submitted to the Commission by the National Association of Broadcasters ("NAB"), which presented 45 broadcaster accounts of the effects of the fairness doctrine on their industry and policies.[5] It is clear, however, that the FCC also relied on important additional sources, including submissions by some proponents of the fairness doctrine. For example, it pointed to evidence from Public Media Center that after it had warned broadcasters that it would demand free response time from stations that accepted advertising on a specific controversy, more than two-thirds of those contacted had refused to sell advertising on the subject at all. 102 F.C.C.2d at 176.
 
 
 55
 The 1985 Report responded substantially to the BCFM and MAP/TRAC attacks made on the NAB study. 102 F.C.C.2d at 172-88. The FCC defenses took several forms. First, critics argued that the NAB examples should be heavily discounted because the participating broadcasters were "self-interested." Id. at 180-82. The FCC noted that because "chill" is a subjective perception, broadcasters' comments provided the best evidence of its existence: "[T]his evidence is more probative than the statements of persons who, by necessity, have to second-guess the broadcasters' state of mind." Id. at 181. The Commission also labeled broadcasters' claims of chilling effect "admission[s] against interest," as such confessions could expose broadcasters to potential fairness doctrine attacks. Id. Finally, the Commission argued that the critics' argument proved too much: "[T]he identical charge could be leveled against every statement of every commenting party. We have never held that the evidence of interested parties lack probity; indeed, were we to adopt such a rule it would be virtually impossible for us to come to any conclusions about any issue raised in this proceeding." Id. See Jeremy Bentham, 7 Rationale of Judicial Evidence, b.9, pt. 3, c.3, p. 393 ff. (Bowring's ed. 1827) ("Any interest, interest of any sort and quantity, sufficient to produce mendacity? As rationale would it be to say, any horse, or dog, or flea, put to a wagon, is sufficient to move it....") quoted in 2 Wigmore on Evidence Sec. 576 (Chadbourn rev. 1979)). We are persuaded that the self-interested character of the broadcasters' evidence did not bar the Commission from giving it substantial weight.
 
 
 56
 Second, the FCC responded to BCFM's and MAP/TRAC's allegations that many of the NAB samples were in fact evidence of chill resulting from the political attack rules and the political editorializing rule, rather than from the Fairness Doctrine. Id. at 186-87. The Commission observed that evidence of chilling from those rules would logically support an inference that the fairness doctrine tended to chill. Indeed, the logic seems exactly the same: if a rule defines specific conduct as a trigger for obligations, the trigger conduct will be more costly and those subject to the rule will be less inclined to indulge in it. In any event, the FCC also said that "none of the evidence of record demonstrating the existence of a 'chilling effect' that is described in this section involves an application of the personal attack rule or the political editorializing rule." Id. at 187 n. 157. Thus, we take it that the Commission properly focused on the evidence directly linked to the fairness doctrine itself.
 
 
 57
 Third, the Commission made specific rebuttals of some of BCFM's and MAP/TRAC's criticisms of NAB examples.[6] For example, one of the criticisms, twice invoked, was that the particular broadcaster need not have been deterred, since in the view of the critics the station's ordinary news coverage would have satisfied its obligations under the doctrine. In rebuttal, the Commission found the critic's observations highly speculative. See id. at 172 n. 104 and at 173 n. 106. Surely the FCC is right. The fairness doctrine applies to ordinary mortals who adjust their affairs on the basis of estimates of risk. The estimating process costs time and effort. It hardly disproves an alleged deterrent effect to suggest that by more careful research or analysis, or by greater brilliance, the deterred party might have come out the other way.[7] This is typical of this line of critiques, and to avoid repetition we pass on to the remaining attacks.
 
 
 58
 Fourth, in the 1985 fairness proceeding, BCFM had discounted 33 of the broadcasters' "examples" (out of 56 as recomputed by BCFM, see note 3 above) as (1) merely reflecting broadcaster hostility but not providing "concrete information" (nine cases); (2) in fact evidencing enhancement of information available to the public (six cases); (3) showing no change in broadcast behavior at all (five cases); and (4) reflecting a fairness complaint but no actual chill (11 cases).
 
 
 59
 UCC appears to be correct in saying that the FCC did not respond directly to these comments, either in the 1985 Report or the present decision. And if we thought that the Commission's reference to "over 60 reported instances" were intended literally to refer to discrete episodes of chilling, we would be troubled by its nonresponse. In fact, however, it is clear that the Commission recognized fully that some of the NAB "examples" were not evidence of episodes but were non-episodic evidence of chilling effect. For example, while BCFM lists Example 7 in its first category--mere expressions of broadcaster hostility to the fairness doctrine, see J.A. Vol. II in Case Nos. 87-1516, 87-1544 at 510-11--that example in fact consists of a statement by the general manager of two stations in Durango, Colorado to the effect that the pressures of the fairness doctrine cause her stations to "think twice" about coverage of controversial issues. Id. at 424. The evidence was thus of a policy or generic response to the doctrine; the Commission expressly invoked the evidence, using NAB's "example" label, but recognizing it as a policy not an episode. See 102 F.C.C.2d at 175 & n. 117. Thus, we think it plain that the Commission was well aware that the NAB "examples" were not all episodes. Moreover, as we look at the NAB "examples" and the BCFM critiques, we are not at all persuaded that the BCFM reclassifications are compelling. Example 7 is not atypical.
 
 
 60
 Finally, UCC attacks any reliance on the NAB study on the ground that it was "not based on a statistically valid sample of broadcasters' experiences, but rather, was merely a series of anecdotal accounts." UCC Brief at 28. The comment is quite valid, but in the absence of either any statistically valid evidence on the other side, or even a suggestion of how the Commission could have constructed a statistically valid study, we are perplexed as to what the Commission was supposed to have done. Editorial decisions are obviously driven by many factors. Isolation of causes in any scientific way seems virtually impossible. The fairness doctrine has been applicable in one form or another from 1949 until the present decision, so the Commission could not compare stations' practices under the rule with their conduct free of the rule. (Comparison to practice in other nations would encounter the usual cross-cultural difficulties.)
 
 
 61
 We note that when speaking of a state-enforced "right-of-reply" applicable to newspapers, the Supreme Court has taken it as self-evident that such a duty "inescapably 'dampens the vigor and limits the variety of public debate.' " Miami-Herald Publishing Co. v. Tornillo, 418 U.S. 241, 257, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (emphasis added). See also Pacific Gas & Electric Co. v. Public Utilities Comm'n of California, 475 U.S. 1, 106 S.Ct. 903, 908, 89 L.Ed.2d 1 (1986) (citing Tornillo to support assumption that California's "[c]ompelled access" to public utility billing envelopes "penalizes the expression of particular points of view"). Of course we recognize that the fairness doctrine differs from the right-of-reply at issue in Tornillo and that Red Lion applies different constitutional standards to the broadcast media. But we think the Court's approach suggests that where a rule imposes potentially onerous and at least irksome consequences on the exercise of speech, there is nothing very startling about an inference that the rule will often deter speech. We think the Commission could properly find that effect from the evidence before it here.
 
 
 62
 Failure to Consider Evidence of Doctrine's Beneficent Effects
 
 
 63
 UCC also charges that the Commission ignored or discounted evidence of the benefits derived from the fairness doctrine. See UCC Brief at 41-46. We think part of the problem here arises out of UCC's apparent assumption that the Commission believed that the fairness doctrine rarely (or never) increased diversity of expression. Indeed, the Commission only purported to find that "the overall net effect of the doctrine is to reduce the coverage of controversial issues of public importance," 2 F.C.C.Rcd. at 5050, a finding clearly consistent with a belief that the doctrine frequently produced its intended effects. We do not read the Commission's focus on the negative aspects as manifesting a blindness to unwelcome evidence but rather as a focus on what it viewed as novel or surprising. To say that a rule has often produced its intended effects is to tell a dog-bites-man story--not front-page stuff. The Commission was naturally more struck by evidence of unintended consequences--hardly in the man-bites-dog class, but closer.
 
 
 64
 In one instance, for example, UCC claims that the FCC twisted some comments which illustrated the efficacy of the doctrine and attempted to use this evidence to show that broadcasters were being chilled as a result of public interest groups' pressure. It points to the Commission's treatment of evidence submitted by the Public Media Center describing an anti-nuclear coalition's campaign to secure free time by invocation of the doctrine. The coalition had indeed asked for and received free time, but it also had invited stations to refuse to sell time and thereby to avoid any fairness problem at all. Over two-thirds pursued that course, whether because of the doctrine or for other reasons. The Commission said this "vividly illustrates the manner in which a complainant can successfully pressure broadcasters into refusing to sell advertising on ballot issues." 102 F.C.C.2d at 176. In the context of this proceeding, we do not read the Commission's characterization as reflecting blindness to the doctrine's positive effects.[8]
 
 
 65
 We must confess, however, some perplexity at the Commission's insistence that the doctrine's overall net effect [was] to reduce the coverage of controversial issues." 2 F.C.C.Rcd. at 5050. The Commission was plainly driven by its effort to resolve the issue not only in policy terms but also in constitutional ones, and it expressly characterized the "net effect" as being "in contravention of the standard announced in Red Lion." Id. The latter indeed said that if in the future it were shown that the fairness and kindred doctrines had "the net effects of reducing rather than enhancing the volume and quality of coverage, there will be time enough to reconsider the constitutional implications." 395 U.S. at 393, 89 S.Ct. at 1808. The Court then proceeded to declare, "[T]he fairness doctrine in the past has had no such overall effect." Id. The Court did not explicate the basis for that finding.
 
 
 66
 We are frankly uncertain how anyone could be sure either way. The definitional problems alone are staggering. How could a court or agency persuasively define standards by which to evaluate the "quality" of coverage? Once it had done so, by what yardstick could it balance quality increments due to broadcasters' responding as intended against quality decrements due to the deterrent effects? The Commission does not explain. Nor do the challengers, who evidently are happy to weigh these unweighables but read the scales differently.
 
 
 67
 Despite this confusion, we believe we can "discern the path" followed by the Commission. See Bowman Transportation, 419 U.S. at 286-89, 95 S.Ct. at 442-43. It found itself confronted with evidence that it read as establishing that the doctrine has very substantial deterrent effects (and, as we have said, we believe that finding was permissible). It also quite plainly made the normative judgment that government decisions on program content and government-forced expressions of ideas, together with the associated risks of partisan abuse, were anathema. See 102 F.C.C.2d at 190-94; 2 F.C.C.Rcd. at 5050-51, 5055-57. It explicitly found support for that value judgment in Supreme Court analyses of the First Amendment as applied to parties other than broadcasters, citing Miami-Herald Publishing Co. v. Tornillo and Pacific Gas & Elec. Co. v. Public Utilities Comm'n of California. See 2 F.C.C.Rcd. at 5057. It was persuaded that the doctrine's deterrent effects were on the same scale as its expression-generating ones, and it plainly discounted the value of the latter as "governmentally-coerced speech." Id. Accordingly it rejected the doctrine as a matter of policy. That policy judgment seems to us by no means arbitrary or capricious, and indeed quite similar to the Supreme Court's finding of similar value judgments implicit in the First Amendment as applied to the print media. And the Commission's course is not rendered arbitrary or capricious by its choosing, as the Court had in Red Lion, to cast its decision in terms of an assessment of the "net effect" of the doctrine.
 
 Failure to Consider Alternatives
 
 68
 Petitioners Geller and Lampert contest the FCC's refusal to adopt their proposed alternative to the elimination of the fairness doctrine. The two have repeatedly urged the Commission to review fairness matters only at license renewal, and to adopt a malice standard for this review.
 
 
 69
 The FCC has twice declined to return to its pre-1962 practice of resolving fairness doctrine complaints at renewal, first in its 1974 Fairness Report, 48 F.C.C.2d at 17-18, affirmed by this court in National Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095 (D.C.Cir.1977), cert. denied, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), and then in its 1987 Alternatives Report, 2 F.C.C.Rcd. 5272, 5276-78. The 1987 Report found that
 
 
 70
 although the renewal-only proposals might appear, at first glance, to lessen the degree of immediate, direct and tangible government intrusion into the editorial processes of broadcast licensees, in actuality the net effect would be merely to postpone the eventuality of extensive governmental involvement at license renewal time.
 
 
 71
 Id. at 5278. The Commission noted several specific defects that it perceived in the renewal review plan. First, by linking fairness evaluations with the renewal process, broadcasters would view the potential sanctions as being more threatening than those currently in effect, as loss of license or suspension would be seen as more likely. Id. Second, the renewal plan deprives the broadcaster of a contemporaneous ruling on its behavior and chance to quickly rectify any imbalance in its programming. The FCC believed this could make broadcasters more conservative in coverage of controversial issues. Id. Finally, it would only delay rather than diminish the government's meddling in the editorial process. Id.
 
 
 72
 Geller and Lampert coupled their renewal-only suggestion with the idea that review would proceed under a "malice" standard such as that of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and with an alternative suggestion that the Commission continue to act case-by-case but under a malice standard. As to the first, the Commission agreed that such a standard would reduce the chilling effect, but judged that reduction inadequate to offset what it believed would be the increased chill from postponement to renewal. 1987 Alternatives Report, 2 F.C.C.Rcd. at 5278. As to the second, the Commission in its reconsideration order in the present case expressed doubt whether a malice standard would substantially reduce the chilling effect when compared with the Commission's practice of deferring to broadcasters' reasonable judgments, 3 F.C.C.Rcd. at 2037, and said that the difference in impact on licensees would be a matter of degree rather than of kind, id. at 2038. Although its discussion of the subject is more than usually framed in constitutional terms, we read it as concluding that the proposals only mildly mitigated the ill effects that drove the Commission to reject the fairness doctrine as previously enforced. That judgment seems well within its discretion, especially as the proposals would also appear to materially diminish the positive effects of the doctrine.
 
 Departure from 1985 Decision
 
 73
 Some parties complain that the present decision represents an unexplained abandonment of the Commission's 1985 decision to persist in enforcement of the doctrine. Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 41-44, 103 S.Ct. 2856, 2865-67, 77 L.Ed.2d 443 (1983) (agency changing course required to supply reasoned analysis for the change); Center for Auto Safety v. Peck, 751 F.2d 1336, 1343 (D.C.Cir.1985).
 
 
 74
 The 1985 Fairness Report had found that the doctrine disserved the public interest, but had refrained from dropping the doctrine on policy grounds only because of concern that perhaps it was statutorily mandated, 102 F.C.C.2d at 227, and because of the intense congressional interest then brewing over the fairness doctrine, id. at 246-47. This court's TRAC decision removed the first obstacle (except insofar as the Supreme Court might find otherwise); a successful presidential veto of Congress's attempt to mandate the fairness doctrine clearly diminished the second. Though we find no explicit reference to these reasons in the decision under review, they appear so obvious and compelling that a remand to extract the magic words from the Commission would be pure waste. See Bowman Transportation, 419 U.S. at 286-89, 95 S.Ct. at 442-43.
 
 V.
 
 75
 Several parties attack the Commission's repeal of the so-called "first prong" of the fairness doctrine--the requirement that broadcasters provide coverage of important controversial issues of interest to the community they serve. First, they contend that they were not adequately notified of the Commission's intent to reconsider the first prong in this proceeding. Second, petitioners argue that the FCC's abandonment of the first prong was arbitrary and capricious.
 
 Notice
 
 76
 We must first explain the relevance of notice. The decision under review has been, up to this point, an adjudication in the classic sense. The Commission disposed of a complaint against Meredith Corporation; its rationale for that decision was that the doctrine under which Meredith had been sanctioned did not serve the public interest (and was unconstitutional). Up to this point we have reviewed the decision as we would any agency adjudication.
 
 
 77
 The Commission's rejection of the first prong of the fairness doctrine, however, was surely not necessary to its exoneration of Meredith here. No one had ever suggested that Meredith had failed to cover controversial issues; quite the contrary, the whole point was that its coverage was enough to trigger a duty under the second prong. Accordingly, viewing the matter purely as an adjudication, the Commission's statements on the first prong might well be dictum and on that account probably unreviewable. See Office of the Consumers' Counsel v. FERC, 808 F.2d 125, 128-29 (D.C.Cir.1987).
 
 
 78
 If, however, the Commission complied with the procedural requirements for an informal rulemaking under 5 U.S.C. Sec. 553 (1982), and if it spoke in the dispositive terms that distinguish a substantive rule from a mere policy statement, see Vietnam Veterans of America v. Secretary of the Navy, 843 F.2d 528, 535-39 (D.C.Cir.1988), then its treatment of the first prong constitutes a substantive rule binding the agency and clearly reviewable. There can be no question here that the Commission purported to dispatch the first prong of the doctrine definitively, and the only procedural flaw that opponents assert is the want of notice.
 
 
 79
 It seems to us clear that the relevant notices reasonably warned interested parties that the Commission was looking at the fairness doctrine as a whole. The Notice of Inquiry leading to the 1985 Fairness Report, 49 Fed.Reg. 20317 (May 14, 1984), said:
 
 
 80
 Our purpose in instituting this inquiry is to undertake the most searching and comprehensive reexamination of the fairness doctrine that this agency has ever had. Our goal is to obtain as complete a record as possible by inviting comment on all facets of the fairness doctrine ...
 
 
 81
 Id. at 20318 (emphasis added).
 
 
 82
 On remand from our decision in Meredith the Commission issued a notice telling interested parties of its plan to review the constitutional and public interest underpinnings of the "fairness doctrine." While that notice did not employ the especially sweeping terms used in the Notice of Inquiry, it spoke of the fairness doctrine generally and specifically linked the proceeding to the prior Inquiry:
 
 
 83
 [t]he Commission hereby requests comment on whether, in light of the 1985 Fairness Report, enforcement of the fairness doctrine is constitutional and whether enforcement of the doctrine is contrary to the public interest. Although the Commission does not ordinarily seek public comment in an adjudicatory proceeding, because of the general importance of the issues in this particular case, the Commission will entertain comments from all interested members of the public ...
 
 
 84
 Order Requesting Comment, FCC 87-33 (Jan. 23, 1987), 52 Fed.Reg. 2805-01 (Jan. 27, 1987).
 
 
 85
 We believe these provided adequate notice that both aspects were under review.
 
 
 86
 Whether Rescission of the First Prong Was Arbitrary and Capricious
 
 
 87
 In explaining its rejection of the first prong, the Commission has argued that the doctrine is a unified whole, so that, once it rejected the second requirement on policy and constitutional grounds, it would be inappropriate to preserve the first. 2 F.C.C.Rcd. at 5048. We regard this as a statement of a conclusion, not a reason, so that if it stood alone we would be compelled to reverse this aspect of the Commission's action. The Commission analogizes its action to that of a court that has held part of a statute unconstitutional and must then consider whether to sever other parts. Reconsideration Order, 3 F.C.C.Rcd. at 2038. The analogy only underscores the deficiency of the Commission's "unified doctrine" declaration. In making a severability decision a court essentially inquires what the legislature would have done had it been aware of the infirmity of one part. Here, the Commission was acting both as adjudicator and legislative body, and was thus perfectly free to decide what it wanted. Moreover, even a court making a severability decision tries to explain why it believes the legislature would prefer the valid portions of the statute to fall or survive. See, for example, Bowsher v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 3192-93, 92 L.Ed.2d 583 (1986).
 
 
 88
 In other portions of its decision, however, the Commission went on to supply reasons for terminating the first prong. The Commission's vigor in expressing these reasons leaves us no serious doubt that it would have proceeded to end the first prong even if it had recognized that its "unified doctrine" statement was a mere conclusion.
 
 
 89
 First, removal of the fairness doctrine's second requirement would reduce the need for the coverage requirement. With the chilling effects of the second requirement ended, the Commission expected that "coverage of controversial issues will be forthcoming naturally, without the need for continued enforcement of the first prong." 3 F.C.C.Rcd. at 2038; see also 102 F.C.C.2d at 161 n. 66. It viewed the first prong as having originated in part as a "backstop[ ]" to the second prong, so that removal of the latter removed much of the reason for the former. 3 F.C.C.Rcd. at 2038.
 
 
 90
 Second, it viewed the coverage requirement as in significant part duplicative of its independent requirement that broadcasters cover issues "of importance" to their communities. 2 F.C.C.Rcd. at 5048.[9] While the FCC acknowledged on reconsideration that the two programming requirements were not identical, it saw sufficient similarity to believe that the community issues rule would fill any material regulatory gap. 3 F.C.C.Rcd. at 2039.
 
 
 91
 Third, in its discussion of the fairness doctrine as a whole the Commission relied heavily on its view that government involvement in the editorial process was offensive. See 102 F.C.C.2d at 190-94; 2 F.C.C.Rcd. at 5050-52, 5055-57; above at 26. That judgment of course applies to the editorial decisions required for enforcement of the first prong, and the Commission made the point expressly: "[T]he doctrine requires the government to second-guess broadcasters' judgment on such sensitive and subjective matters as the 'controversiality' and 'public importance' of a particular issue...." 2 F.C.C.Rcd. at 5052. It also alluded to the offensive character of government first-prong decisions in distinguishing that part of the doctrine from the community issues requirement:
 
 
 92
 While enforcement of the doctrine's first prong requires the government to judge, on a case-by-case basis, whether a specific issue is both controversial and of vital importance to mandate coverage by the broadcaster, enforcement of the issue responsive obligation requires a different level of government intervention in determining, at renewal time, whether broadcasters' overall programming covered the needs and interests of its community.
 
 
 93
 3 F.C.C.Rcd. at 2042 n. 67 (emphasis in original). Compare separate opinion of Judge Wald at 671-72 (suggesting that the Commission failed to identify any drawbacks in enforcement of the first prong).
 
 
 94
 We believe that these reasons, particularly in light of the Commission's background findings on the increased diversity of outlets and programming, adequately support its removal of the first prong.
 
 CONCLUSION
 
 95
 We conclude that the FCC's decision that the fairness doctrine no longer served the public interest was neither arbitrary, capricious nor an abuse of discretion, and are convinced that it would have acted on that finding to terminate the doctrine even in the absence of its belief that the doctrine was no longer constitutional. Accordingly we uphold the Commission without reaching the constitutional issues. The petition for review is denied.
 
 
 96
 WALD, Chief Judge, concurring in part and dissenting in part:
 
 
 97
 I concur in Parts I-IV of Judge Williams' opinion, which uphold the FCC's decision to abrogate the second prong of the fairness doctrine as an exercise of its statutory authority to regulate in the public interest. I dissent, however, from Part V, which sustains the Commission's decision to eliminate the fairness doctrine's first prong, an FCC rule requiring broadcasters to "provide coverage of vitally important controversial issues of interest in the community served by the licensees." See 1985 Fairness Report, 102 F.C.C.2d at 146. I believe that this aspect of the Commission's decision is not supported by the record and was not adopted in compliance with the Administrative Procedure Act.
 
 
 98
 First, the agency failed to provide interested parties with notice, as required by the Administrative Procedure Act, that it proposed to eliminate the first as well as the second prong of the doctrine. I reject the Commission's suggestion that, since an adjudication rather than a rulemaking was involved, no notice was required. See Brief for FCC at 42. Of course the FCC has broad latitude to choose between adjudication and notice-and-comment rulemaking in instituting policy changes. But even if an adjudication is the chosen vehicle, the parties at least must be told if a relevant policy is being reevaluated. See Eastern Carolinas Broadcasting Co. v. FCC, 762 F.2d 95, 101 (D.C.Cir.1985). And certainly an agency cannot be permitted to evade the requirements of notice and comment by using an adjudication as a vehicle for resolving an issue which does not affect the interests of the parties. Here Meredith was not accused of violating the first prong of the fairness doctrine at all; this aspect of the doctrine could therefore be changed only after interested persons were provided with notice and an opportunity to comment.
 
 
 99
 The FCC did not provide adequate notice of a proposed change in the doctrine's first prong. The Notice of Inquiry published in the Federal Register stated that "[t]he Commission hereby requests comment on whether, in light of the 1985 Fairness Report, enforcement of the fairness doctrine is constitutional and whether enforcement of the doctrine is contrary to the public interest." 52 Fed.Reg. 2805 (1987) (emphasis added). Since the 1985 Report nowhere discussed the desirability of abrogating the first prong, interested parties could not have been forewarned that the first as well as the second prong of the fairness doctrine was vulnerable to elimination.
 
 
 100
 The Commission's position is that any thorough examination of the fairness doctrine would necessarily include an appraisal of the first prong. The Commission argues that reasonable persons reading the Notice of Inquiry should have known that the first prong would be at issue. That argument is belied by the 1985 Fairness Report itself: that Report was billed by the FCC as an exhaustive examination of the doctrine, yet it contained no discussion at all concerning the desirability of retaining the first prong if the second prong were discarded. The FCC's position is further weakened by the fact that its Notice of Inquiry apparently failed to attract any public comment whatsoever concerning the desirability of retaining the first prong if the second were eliminated..[1] ]
 
 
 101
 But even if the Commission had provided adequate notice of its intentions, I do not believe that its decision could be sustained as reasoned decisionmaking. The FCC has offered three arguments in support of the elimination of the first prong.[2] First, analogizing to principles concerning the severability of statutes, the Commission argued that the fairness doctrine was a unified whole and that one part therefore could not be severed from the rest. Second, the Commission concluded that the obligations imposed by the first prong were comparable to those imposed by the existing duty of broadcasters to cover issues of importance to their communities, see Deregulation of Radio, 84 F.C.C.2d 968, 982-83, recon. denied, 87 F.C.C.2d 797 (1981), rev'd in part on other grounds, Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983), and that "retaining both obligations would be duplicative." Syracuse Peace Council, 2 F.C.C.Rcd. 5043, 5048 (1987). Finally, the Commission argued that enforcement of the first prong would no longer be necessary: with the chilling effect of the second prong removed, broadcasters would of their own volition cover controversial issues.
 
 
 102
 The Commission's first two arguments appear flatly contradictory. The agency is arguing both that the first prong makes no sense without the second and that it will in essence continue to enforce the first prong under a different authority. If the first prong is desirable only as an adjunct to the second, and if the community issues requirement is substantially equivalent to the first prong, then it is not at all clear why the agency bothers to keep the community issues rule on the books at all.[3] Leaving this incongruity aside, however, the Commission's three arguments do not, in my view, meet the threshold of reasonableness.
 
 
 103
 As my colleagues recognize, the Commission's analogy to the severability of statutes is misguided. See Williams op. at 667, Starr op. at 687. In deciding whether to sever the defective part of a statute, a court inquires into legislative intent: would the enacting body have wished to let the rest of the statute stand without the offensive part? Since the Commission functions as both an adjudicative and rulemaking body, it need not inquire into what some other entity would have decided: it can make the choice for itself. The agency's purported reliance on severability principles is thus merely a reaffirmation of its basic decision not to retain the first prong. It has made no case that it could not, if it wished, enforce one prong without the other.
 
 
 104
 Neither can the Commission's action be justified by reference to the overlap between first prong obligations and the duty to cover issues of importance to the community. While a substantial overlap does exist, the requirements are by no means duplicative.[4] The community issues requirement obliges broadcasters to devote reasonable air time to the coverage of issues important to the local community. The first prong of the fairness doctrine focuses on the broadcaster's obligation to cover controversial issues. It seems entirely foreseeable that some broadcasters might provide abundant coverage of community issues generally but might--perhaps from fear of incurring the displeasure of the public or of advertisers--steer clear of issues of a controversial nature. In another proceeding, in fact, the FCC has emphasized the distinction between the two obligations. See Deregulation of Radio, 84 F.C.C.2d at 983 n. 36. The community issues requirement, in short, imposes obligations which are related to but distinct from the broadcaster's duties under the first prong. The continued viability of the community issues requirement is therefore an insufficient justification for the abrogation of the first prong.
 
 
 105
 Finally, I am unconvinced by the agency's assertion that the demise of the first prong is justified because, in the absence of the chill produced by the second prong's requirements, broadcasters can be expected to cover controversial issues voluntarily. Certainly the Commission might reasonably conclude that the first prong would become a less significant regulatory tool once the second prong had been eliminated. But the FCC has made no argument that, once the second prong is eliminated, the first prong will be counterproductive. The FCC's position is in essence that, after the demise of the second prong, most broadcasters will not need the incentive provided by the first prong. This seems to me to be plainly insufficient to justify repeal.
 
 
 106
 Clearly an agency could not justify the promulgation of a new regulation by arguing merely that the rule would not do much harm. The FCC appears, however, to defend the converse of this position: the agency asserts that the first prong may be eliminated simply because, after the second prong's elimination, the first prong is likely to do little good. The agency's position in this case seems to rest on an implicit distinction between the initiation and the abrogation of rules. That distinction, however, has been flatly rejected by the Supreme Court. "Revocation constitutes a reversal of the agency's former views as to the proper course.... In the abstract, there is no more reason to presume that changing circumstances require the rescission of prior action, instead of a revision in or even the extension of current regulation. If Congress established a presumption from which judicial review should start, that presumption ... is not against ... regulation, but against changes in current policy that are not justified by the rulemaking record." Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 41, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (emphasis in original). It was therefore incumbent upon the Commission to establish some plausible basis for believing that the world would somehow be better if the first prong were eliminated. The agency made no attempt whatsoever to articulate such a basis.
 
 
 107
 Of course, in one respect the decision to deregulate may legitimately involve a different calculus from that required for the promulgation of a new rule. An agency making regulatory decisions may take administrative costs into account; consequently, an agency might sometimes justify the abrogation of a rule on the ground that its beneficial effects are small and that these benefits will be outweighed by the costs of its administration.[5] In the present case, however, the Commission neither referred to nor presented evidence of the costs of administering the first prong as a justification for the agency's decision.
 
 
 108
 The real-world effects of the first prong's demise are difficult to predict. It might be that, with the removal of the second prong, the first prong would have been reduced in significance. On the other hand, the Commission may have overestimated the extent to which market forces will foster programming on controversial issues. This is a predictive judgment on which courts would ordinarily defer to agency discretion. Here, however, the uncertainty concerns only the size of the benefit which the first prong would produce; the agency has failed to identify any costs.[6]
 
 
 109
 In arguing that the Commission has met its burden of identifying the disadvantages of continued first prong enforcement, Judge Williams relies heavily on the following passage from the agency's opinion on Reconsideration: "While enforcement of the doctrine's first prong requires the government to judge, on a case-by-case basis, whether a specific issue is both controversial and of vital importance to mandate coverage by the broadcaster, enforcement of the issue responsive obligation requires a different level of government intervention in determining, at renewal time, whether broadcaster's overall programming covered the needs and interests of its community." Syracuse Peace Council (Reconsideration), 3 F.C.C.Rcd. at 2042 n. 67 (emphasis in original). See Williams op. at 668. The Commission appears to argue that continued first prong enforcement would impose significant regulatory burdens, over and above those imposed by other rules, because case-by-case review of specific programming decisions is a particularly intrusive form of broadcast regulation. For two reasons, however, I believe that this passage fails to support the Commission's decision.
 
 
 110
 First, the passage quoted by Judge Williams is flatly inconsistent with other elements of the agency's reasoning. In its Fairness Alternatives Report, the Commission rejected a proposal that enforcement of the fairness doctrine (first and second prongs) take place at renewal time. The FCC asserted that "the chilling effects under a renewal-only approach would be significantly heightened, rather than decreased." 2 F.C.C.Rcd. at 5278. Renewal-time scrutiny, the agency reasoned, would be more intrusive because "the stakes for a violation of the rules would be greatly raised" and because "a broadcaster would be deprived of a contemporaneous ruling on the merits of a fairness complaint." Id. I therefore cannot give deference to the Commission's subsequent assertion that contemporaneous scrutiny of particular programming decisions (under the first prong) would be more burdensome than renewal-time review of a station's overall programming (under the community issues requirement).
 
 
 111
 Moreover, I do not believe that the FCC's obligation to identify the costs of an unwanted regulation could be satisfied by a bare showing that the rule would impinge on broadcasters' editorial freedom. I believe it is still the law that, in the regulation of electronic media, "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). I therefore believe that it was incumbent on the Commission to identify some plausible chain of events through which a given restriction on editorial discretion could be expected to lead to a reduction in the range or quality of programming available to the public. In explaining its decision to eliminate the fairness doctrine's second prong, the FCC did not emphasize the hardships suffered by broadcasters.. Rather, the agency quite properly focused on the ways in which enforcement of the rule might chill controversial speech and thereby adversely affect the range of available programming. But the Commission has made no effort whatsoever to explain how continued enforcement of the doctrine's first prong could induce broadcasters to alter their programming decisions in ways which would ultimately disserve the public interest.
 
 
 112
 I dissent from the Commission's eradication of prong one because the agency's actions appear to me the very model of arbitrary and capricious decisionmaking. The Commission did not provide interested parties with adequate notice that the first prong was under review. Moreover, the agency has provided absolutely no evidence--indeed, it has not even asserted--that the net effect of continued enforcement would be harmful. In fact, the agency has failed to identify any deleterious effects whatsoever of continued first prong enforcement. In eliminating prong one along with prong two of the fairness doctrine, the FCC appears to have been motivated primarily by a morbid fear that it might be accused of doing things halfway. This is deregulation running riot.
 
 STARR, Circuit Judge, concurring:
 
 113
 As my colleagues faithfully recount, this case was launched with the FCC's order holding that Meredith Corporation violated the fairness doctrine. Syracuse Peace Council, 99 FCC 2d 1389 (1984). When the case arrived here almost two years ago, a panel of this court held that the FCC had erroneously failed to consider Meredith's contention that the doctrine violated the First Amendment. Meredith Corp. v. FCC, 809 F.2d 863 (D.C.Cir.1987). Our colleagues explained, in emphatic terms, that the FCC could not, consistent with its duty to uphold the Constitution, enforce the doctrine without considering its constitutionality. Id. at 874. In particular, consideration of constitutionally based objections was held to be properly within the Commission's purview since, under Telecommunications Research and Action Center v. FCC, 801 F.2d 501 (D.C.Cir.1986), the fairness doctrine represented only an FCC policy, not a statutory requirement.
 
 
 114
 The upshot was that the Meredith panel remanded the case to the Commission with express instructions to consider Meredith's First Amendment claim or to resolve the case on the ground that the fairness doctrine violates the "public interest" standard. Meredith Corp. v. FCC, 809 F.2d at 874. Following that remand, the FCC vacated its previous finding that Meredith had violated the doctrine and concluded that "the fairness doctrine contravenes the First Amendment and thereby disserves the public interest." 2 FCC Rcd Vol. 17, 5043, 5057 (1987) ("Order" hereinafter).
 
 
 115
 Now the case makes its return visit. After elaborate briefing on the constitutional issue resolved by the Commission in conformity with the Meredith remand, my colleagues have arrived at the view--urged by no one in the case--that our analysis can properly proceed by, in effect, blue penciling the Commission's language purporting to base the agency's action on constitutional grounds. The majority's methodology of restraint flows, quite understandably, from the salutary principle that courts must avoid deciding constitutional issues where nonconstitutional grounds of decision are available. See e.g., Ashwander v. TVA, 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-84, 80 L.Ed. 688 (1935) (Brandeis, J. concurring). But the applicability of that venerable principle here is very much in doubt. For one thing, we have no statute before us, but only an agency-minted policy which by its very nature implicates the most profound First Amendment interests. For another, the issue comes to us in an administrative law setting with the agency expressly relying upon constitutional considerations and rendering a constitutional judgment. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942); see also FPC v. Texaco, Inc., 417 U.S. 380, 395-97, 94 S.Ct. 2315, 2325-27, 41 L.Ed.2d 141 (1974); Gulf States Utils. Co. v. FPC, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973). Taken together, the two very different cases of Ashwander and Chenery teach that a court is to base its review of agency action on non-constitutional grounds if the record reveals that the agency in fact based its decision, either exclusively or alternatively, on such grounds. The agency's analysis must, perforce, shape the contours of the court's consideration.
 
 
 116
 After reflecting on the effect of Ashwander and Chenery principles, I cannot, in conscience, subscribe to my colleagues' approach. With all respect to the court's view enunciated today, I am convinced that the record in this case simply will not, fairly read, yield the conclusion that the agency has based the specific decision before us independently on non-constitutional grounds. There is, therefore, no proper basis for skirting the Commission's constitutional analysis (unless we were to conclude, as I do not, that the Commission erred in even considering that issue); in short, the constitutional justifications for the Commission's action must, alas, be considered.
 
 
 117
 To state briefly the pertinent background: On remand from this court, the Commission based the decision now before us on (1) the adjudicatory record prior to remand, (2) public comments received following remand, and (3) the Commission's 1985 Fairness Report. As the Court's opinion today rightly emphasizes, the 1985 Report reflected an extensive, public-interest inquiry into the current impact of the fairness doctrine. Order at 5043. The Commission then explained its decision as follows:
 
 
 118
 The [Meredith] court ordered the Commission to consider Meredith's constitutional arguments unless it decided, on policy grounds, not to enforce the fairness doctrine. As we began to examine the policy issues ... it became evident to us that the policy and constitutional considerations in this matter are inextricably intertwined and that it would be difficult, if not impossible, to isolate the policy considerations from the constitutional aspects underlying the doctrine. We believe, as a result, that it is appropriate and necessary to address the policy and constitutional issues together....
 
 
 119
 Order at 5046 (emphasis added).[1] The agency's language can scarcely be clearer; in response to the terms of the Meredith remand, the FCC expressly declined to avoid the constitutional issue by resolving the case solely on policy (or public interest) grounds.
 
 
 120
 With that, the Commission then proceeded to engage in an elaborate, First Amendment analysis based on the Supreme Court's opinion in Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Order at 5048-52. The FCC's Order is rooted firmly in Red Lion. Wherever one looks in the opinion, one sees the FCC wrestling with Red Lion. Red Lion, it goes without saying, is manifestly not a "public interest" decision; it is a constitutional decision of the first order grounded entirely on the overarching demands of the First Amendment. What the FCC itself characterizes as the "inextricably intertwined" nature of the constitutional-policy inquiry, coupled with what can only be characterized in truth as the FCC's First Amendment mode of analysis, demonstrates beyond peradventure that the agency was examining the fairness doctrine's lawfulness through First Amendment lenses.[2]
 
 
 121
 It therefore cannot successfully be maintained that the Order is based, either exclusively or alternatively, on public interest grounds. To be sure, as my colleagues understandably emphasize, the Order relies heavily on the FCC's 1985 Fairness Report, in which the Commission concluded that the fairness doctrine violated the public interest standard. 1985 Fairness Report, 102 FCC 2d 145 (1985). But if the Commission were deciding a public-interest issue alone, without more, all it would have needed to do was dust off and press into service the 1985 Report. Indeed, there is not the slightest hint that the FCC in 1987 viewed its magnum opus of only two years earlier as sufficient to the purpose at hand. Rather, the Commission decided, in light of the Meredith remand, to tangle with Red Lion itself. There is no escaping this hard, cold fact: in the wake of the generously worded Meredith remand, the Commission has rendered a Red Lion decision. It has switched gears from three years ago and gone beyond the less heroic, public-interest reach of the 1985 Report.
 
 
 122
 Now this should come as no surprise to anyone in this courthouse. At the time of the 1985 Report, the Commission was understandably reluctant to cast its conclusions in constitutional terms. The obvious reason for this becoming modesty and restraint was that it had not yet been determined whether the fairness doctrine was indeed codified by the Communications Act. 1985 Fairness Report, 102 FCC 2d at 155-56. As I see it, any differences between the 1985 Report and the current Order reflect not a shift in the FCC's substantive position, but a sea change in the Commission's authority to articulate its views.[3]
 
 
 123
 Without fully taking account of the unique legal context surrounding the 1985 Report, the court today relies upon what it views as the Order's "wholesale" incorporation of the 1985 Report to demonstrate that the FCC has in fact rendered a public interest decision. The court ferrets out and features a footnote buried deep in the Order--footnote number 120 to be exact--to buttress its position. That humble, but obviously pivotal (to my colleagues) footnote reads:
 
 
 124
 We hereby incorporate the findings of the 1985 Fairness Report into this record and, as more fully explained below, reaffirm the findings and conclusions contained in that Report." (emphasis added)
 
 
 125
 Order at 5066 n. 120.
 
 
 126
 The footnote, in turn, references the following passage:
 
 
 127
 We shall thus consider the constitutionality of the fairness doctrine from the perspective both of the public and the broadcast licensees. In so doing, we shall examine the record developed in this case and in the 1985 Fairness Report[120] to determine, in accordance with existing Supreme Court precedent, whether the enforcement of the fairness doctrine (1) chills speech and results in a net reduction of the presentation of controversial issues of public concern and (2) excessively infringes on the editorial discretion of broadcast journalists and involves unnecessary government intervention to the extent that it is no longer narrowly tailored to meet its objective.
 
 
 128
 Id. at 5049.
 
 
 129
 This passage, appearing as it does in a portion of the Order entitled "Constitutional Considerations Under Red Lion" scarcely lends support to the conclusion that the FCC based its Order independently on public interest grounds. Indeed, the FCC could not have been more explicit in utilizing the Order only for its factual determinations, in particular the doctrine's chilling effect and impact on editorial discretion, but not for the Report's ultimate conclusion.[4] See also Order at 5043 (listing six determinations of the 1985 Report, all of which go to the doctrine's constitutionality).
 
 
 130
 In short, the record establishes beyond cavil (1) that the FCC based its Order on the premise that the First Amendment questions and public interest issues are "inextricably intertwined" and (2) that the Commission engaged in a Red Lion analysis. It follows from Chenery that this court is wanting in authority to wave all that pesky constitutional analysis away and pretend that what we have before us, in effect, is the 1985 Report. Meredith has unleashed Red Lion, and it will not do to pretend, with cheery bravado, that Red Lion is still secure in its pre-Meredith cage. Red Lion is now out on the streets, released by a deliberate and careful FCC decision.
 
 
 131
 For its part, the court airily treats this as just another case coming out of yet another agency here in town charged with making yet another broad public interest determination. This will not do. What is going on, with all respect, is a fundamental administrative law no-no. Chenery is, after all, not a prudential doctrine designed to facilitate judicial review. To the contrary, Chenery helps maintain the proper spheres of court and agency as ordained by the Administrative Procedure Act, 5 U.S.C. Sec. 706 (1985):
 
 
 132
 If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.
 
 
 133
 SEC v. Chenery Corp., 318 U.S. at 88, 63 S.Ct. at 459.
 
 
 134
 Where, as here, Congress has committed the determination of the public interest to the FCC, "[i]t is not for us to determine independently what is 'detrimental to the public interest' ... The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act." Id. at 94, 63 S.Ct. at 462 (citations omitted); see also I.C.C. v. Brotherhood of Locomotive Engineers, 482 U.S. 270, 107 S.Ct. 2360, 2368, 96 L.Ed.2d 222 (1987) (court "may not affirm on a basis containing any element of discretion--including discretion to find facts and interpret statutory ambiguities--that is not the basis the agency used, since that would remove the discretionary judgment from the agency to the court").
 
 
 135
 In sum, the public interest standard should not be reified as a brooding omnipresence that, notwithstanding both the adjudicatory record and the FCC's explicit reliance on a Red Lion (constitutional) analysis, remains ever available to the judiciary as an independent ground of decision. Where, as here, the agency's policy judgment is wholly driven by its constitutional reasoning and conclusions, the reviewing court is obliged to analyse the case in those terms.[5] The approach followed today, I believe, conflates the court's function with the agency's prerogative of giving reasoned content, consistent with constitutional norms, to a statutory standard and thus inadvertently does violence to the basic framework of the modern administrative state.
 
 
 136
 The court's stated basis for avoiding Chenery's dictates, it appears, is that we can compel the FCC to analyze the public interest in other than constitutional terms: "[I]f the Commission had written its opinion in purely constitutional terms, we would have no choice but to address the constitutional issue or--more likely--to remand to the Commission for it to rearrange horse and cart." Maj. Op. at 659. I think not. Under governing standards,[6] the Commission's decision to view the public interest as driven by First Amendment values (when other considerations, e.g., broad notions of broadcasters as public trustees, were available) is eminently reasonable. The FCC has never wavered from justifying the fairness doctrine, instrumentally, by reference to the fostering of First Amendment values. See, e.g., Fairness Report in Docket No. 19260, 48 F.C.C.2d 1, 4-7 (1974); Editorializing by Broadcast Licensees, 13 FCC 1246, 1256-57 (1949); Great Lakes Broadcasting Co., 3 F.R.C.Ann.Rep. 32, 33 (1929); rev'd on other grounds, 37 F.2d 993 (D.C.Cir.), cert. denied, 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1933). This view, moreover, has been repeatedly endorsed by the Supreme Court. See, e.g., FCC v. League of Women Voters, 468 U.S. 364, 380, 104 S.Ct. 3106, 3117, 82 L.Ed.2d 278 (1984) (the thrust of broadcast regulation "has generally been to secure the public's First Amendment interest in receiving a balanced presentation of views ..."); FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 795, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("the public interest standard necessarily invites reference to First Amendment principles"); Columbia Broadcasting System v. Democratic National Comm., 412 U.S. 94, 122, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1973) (same); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 375, 89 S.Ct. 1794, 1798, 23 L.Ed.2d 371 (1969) (fairness doctrine is permissible because it enhances rather than abridges freedom of speech). Indeed, the Supreme Court has expressly invited the FCC to examine whether the constitutional underpinnings of the doctrine remain viable. FCC v. League of Women Voters, 468 U.S. 364, 377 n. 11, 104 S.Ct. 3106, 3116 n. 11, 82 L.Ed.2d 278 (1984). In view of the fairness doctrine's unique, constitutionally-charged history, it is hardly unreasonable for the FCC to view the public interest through First Amendment lenses.
 
 
 137
 Nor is the resulting public interest-First Amendment linkage surprising in view of our Nation's historic skepticism, rooted firmly in law, as to the efficacy (and legitimacy) of governmental efforts to regulate the content of speech. There is simply nothing novel about the FCC's determination that, for purposes of evaluating the fairness doctrine, the public interest is "inextricably intertwined" with the First Amendment. Although a regulatory regime might be hypothesized in which the FCC attempted to promote non-First Amendment goals (i.e., equality values inherent in mandated access provisions) through regulation of broadcasting content, that sort of regime is manifestly not required by the Communications Act, and it is emphatically not an abuse of discretion for the Commission to decline to craft such a regime.
 
 
 138
 The foregoing satisfies me that a remand to delink that which the agency has viewed as inextricably intertwined would be painfully inappropriate. It would also be a bit cheeky, in light of Meredith's generous terms of remand. In short, the Commission's determination that the public interest is inextricably related to First Amendment values is, I believe, fully consistent with the statute and explained with sufficient clarity and cogency to constitute a valid exercise of discretion. The fact that the court, informed by Ashwander principles, might prefer to review a decision based independently on public interest grounds does not warrant judicial compulsion that the FCC exercise its judgment in that manner. SEC v. Chenery Co., 318 U.S. at 94, 63 S.Ct. at 462; Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 549, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1977).
 
 
 139
 Remand would also be inappropriate because there is not the slightest indication that, on yet another remand, the FCC would elect to change its interpretation of the public interest-First Amendment relationship. Cf. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766-67 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969) ("Chenery does not require that we convert judicial review of agency action into a ping-pong game"). These admonitions against futile remands have all the more bite here in view of the explicit authorization that the Meredith court gave to an agency decision resting on constitutional grounds. Meredith v. FCC, 809 F.2d at 874. It goes without saying that this panel is powerless to revisit our colleagues' earlier handiwork, and even if we could, I for one see no need whatever to take that step.
 
 
 140
 That brings me to this: the court's discussion of remand, with all respect, misses the mark in concluding that affirmance on public interest grounds is justified because, in the absence of a public interest-First Amendment linkage the Commission would undoubtedly reject the fairness doctrine on policy grounds. Maj. Op. at 659. As previously discussed, the relevant point is whether the court may, in effect, create this set of circumstances by ordering the FCC to make a separate and independent public interest determination.[7] This sort of judicial compulsion of an independent agency is not authorized by Ashwander, which assumes that a non-constitutional ground of decision is legitimately available. Cf. Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 841-42, 106 S.Ct. 3245, 3253, 92 L.Ed.2d 675 (1985) (Ashwander requires that the non-constitutional construction relied upon be "fairly possible").
 
 
 141
 Yet, when the court attempts to bypass Chenery and support its conclusion that the Commission would have found the fairness doctrine to contravene the public interest, it finds only the constitutional reasoning that permeates the Order. No separate ground exists for the majority to plant the Ashwander flag. For example, the court cites the Commission's condemnation of the doctrine's restriction on diverse viewpoints, interference with broadcasters' expression rights, and chilling effect, and then notes that "[i]t is hard to imagine any mental gymnastics by which the Commission, having delivered itself of such a condemnation, could go on to find the doctrine in the public interest." Maj. Op. at 659. Exactly. The Commission's reasoning, which no mental gymnastics could reasonably characterize as anything but constitutional analysis, renders problematic any contrary public interest determination (e.g., accepting First Amendment losses to achieve equality gains), just as the Commission has claimed throughout its Order and these proceedings. But that does not render the Order before us any less a constitutional decision, and no alchemy can transform the Commission's gilt-edged reasoning into the lead of a public interest determination.
 
 
 142
 The court's "perplexity," provoked by the Commission's central conclusion (that the doctrine's "overall net effect [was] to reduce the coverage of controversial issues," 2 F.C.C.2d at 5050), further attests to the fundamentally constitutional nature of the Order. Maj. Op. at 665. The court finds the Commission's conclusion of "net effect" incoherent as a matter of orthodox administrative law reasoning about the public interest, id. at 665, but upholds the conclusion as "quite similar to the Supreme Court's finding of similar value judgments implicit in the [F]irst Amendment as applied to the print media." Id. at 665. Once again, exactly. As the Commission insists, we customarily call such reasoning "constitutional." But the court wishes to term that reasoning "a matter of policy," id., and "an effort to resolve the issue not only in policy terms but also in constitutional ones," id. at 665. With all respect, the court can find only constitutional reasoning within the Order and can support the Order only by relying upon constitutional reasoning. Deeming that reasoning "policy" cannot call forth Ashwander, and footnote 120 cannot sweep away the rest of the Order.
 
 
 143
 In sum, as the FCC's decision is adequate in all respects and singularly unlikely to be altered on remand, I think the court is obliged to examine the FCC's decision--grounded in the Constitution--as it comes to us. It is to that issue, avoided by my colleagues, but pressed exclusively by all parties before this court,[8] that I must now turn.
 
 II
 
 144
 * The question before us--that is, the legality of the FCC's action--is somewhat of a hybrid, exhibiting both constitutional and administrative law characteristics. As I see it, judicial review of the FCC's Order is most correctly viewed as involving two distinct tasks. First, the court is called upon to scrutinize the Commission's interpretation of the constitutional principles enunciated in Red Lion and its progeny. This task involves measuring the FCC's articulation of constitutional principles, as distinguished from its application of those principles to the facts. Our scope of review in this particular is plenary. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); see also Monaghan, Marbury and the Administrative State, 83 Col.L.Rev. 1, 6 (1983) (criticizing the view that Marbury supports independent review of agency statutory interpretation). Second, we are called upon to review the Commission's factual determinations. Of especial importance in this particular are the FCC's findings (1) that an "explosion" in the number and type of media outlets has occurred; (2) that the fairness doctrine chills speech and thereby effects a net reduction in coverage of controversial public issues; and (3) that the fairness doctrine unduly impinges upon broadcasters' editorial discretion.
 
 
 145
 The parties have assumed that the Commission's findings of fact are subject to review under the "arbitrary and capricious" standard laid down in the APA, 5 U.S.C. Sec. 706 (1985); see e.g., Brief of Syracuse Peace Council at 10. However, where, as here, factual determinations are intimately connected with the evaluation of constitutionality under the First Amendment, the Supreme Court has held (outside the agency context) that those findings should be reviewed independently. Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 506-10, 104 S.Ct. 1949, 1962-64, 80 L.Ed.2d 502 (1984) (and cases cited therein). On reflection, I believe that in this instance the parties' assumption is well-founded; the administrative law model of review indeed applies notwithstanding the presence of important First Amendment questions. Although the FCC's factual findings are closely intermingled with its ultimate conclusion as to the constitutionality vel non of the fairness doctrine, independent review by the judiciary seems inappropriate for several reasons.
 
 
 146
 First, the FCC's Order does not deny a constitutional claim. No one has urged that the fairness doctrine is constitutionally compelled. Rather, the FCC has determined, pursuant to its obligation to uphold the Constitution, that the First Amendment requires elimination of the fairness doctrine. That point is of pivotal importance because the decisional law of the Supreme Court indicates that independent appellate review of facts is appropriate only where the decision under review denies a constitutional claim. See, e.g., Time, Inc. v. Pape, 401 U.S. 279, 284, 91 S.Ct. 633, 636, 28 L.Ed.2d 45 (1971) (independent review will be exercised "in cases in which there is a claim of denial of rights under the Federal Constitution"); New York Times v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) (independent review functions to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression") (citations omitted).
 
 
 147
 This conclusion flows from the principle that independent review, where applicable, derives from the Constitution itself. Bose v. Consumers Union, 466 U.S. at 510, 104 S.Ct. at 1965 ("The requirement of independent review ... is a rule of federal constitutional law"). Thus, where no constitutional rights are threatened by the findings at issue, the reason undergirding the unusual tack of independent appellate review of facts does not exist. Id. at 506 n. 24, 104 S.Ct. at 1962 n. 24 (citing Fiske v. Kansas, 274 U.S. 380, 385-87, 47 S.Ct. 655, 656-57, 71 L.Ed. 1108 (1927)). Indeed, in the present circumstances (i.e., an agency decision) a limited standard of review has been imposed by Congress in the familiar precincts of the APA.
 
 
 148
 Independent review of the Commission's findings also seems inappropriate because we have before us the predictive judgments of a federal agency concerning the (perceived) effects of its own policy. The Supreme Court has recognized that the FCC is possessed of substantial expertise with respect to the impact of the fairness doctrine on the communications marketplace. See, e.g., FCC v. League of Women Voters of California, 468 U.S. 364, 379 n. 12, 104 S.Ct. 3106 n. 12, 82 L.Ed.2d 278 (1983). Indeed, the Court has accorded weight to factual findings underlying an FCC decision that broadcast regulation was inconsistent with the First Amendment. Columbia Broadcasting System, Inc. v. Dem. Nat'l Comm., 412 U.S. 94, 122-23, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1973). The present case is thus readily distinguishable from instances in which the Supreme Court has independently reviewed the case-specific findings of juries or trial judges. See e.g., Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (independent review of jury determination that a specific publication or film is "patently offensive" and appeals to the "prurient interest"). In view of the FCC's obvious expertise, we would be unwise (and unfaithful to the APA) to disregard the Commission's ultimate conclusions of fact with respect to the fairness doctrine's chilling effect; its interference with broadcasters' editorial discretion; and the explosive growth of media outlets.
 
 B
 
 149
 Under these principles, the Commission's Order should be upheld. It is based on reasonable factual findings and embodies a correct statement of applicable constitutional principles. From the foregoing discussion of the applicable scope of review, it should be evident that our evaluation of the Commission's factual determinations partakes more of the nature of administrative law than of constitutional law analysis. That is, it would be anomalous if judicial approval of agency factual findings were awarded the Olympian force of a "true" constitutional decision, see Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), where those findings were subjected only to limited, administrative law-genre scrutiny.
 
 
 150
 Vindication of the constitutional reasoning in the Order thus would not constitute a judicial determination that the fairness doctrine (as currently administered) is "unconstitutional."[9] To reiterate: I would hold only that the FCC's decision to eliminate the fairness doctrine correctly interprets Red Lion and is based, as the court's opinion effectively demonstrates, on an adequate factual record. Such a decision would therefore not automatically foreclose a future FCC (or Congress) from reestablishing the fairness doctrine in its present (or some modified) form. The fate of any future attempt to resurrect (or refashion) the fairness doctrine would depend, obviously, on the Supreme Court's articulation of applicable constitutional doctrine (e.g., Red Lion ); but it would also be affected by the scope of review applied to the facts upon which the "new" fairness doctrine was sought to be justified. Of course, as we have just seen, the line of cases culminating in Bose Corp. indicates that factual findings underlying the denial of a First Amendment challenge would be subject to independent review. Although this situation is, again, not before us today, it bears mentioning that this additional burden imposed on proponents of allegedly unconstitutional government action (i.e., a "new" or "resurrected" fairness doctrine) represents the inevitable result of our system of constitutional supremacy.
 
 
 151
 I should hasten to add that this burden, while substantial, appears to be by no means hopelessly insurmountable. To the contrary, under the Red Lion framework (assuming, as I do, continued High Court allegiance to its teachings), the constitutionality of the fairness doctrine is linked in part to technological developments (and behavior) in the communications marketplace. Those developments obviously continue to unfold, with impacts that can only foggily be predicted. What is more, we have precious little experience in a sans-fairness doctrine regulatory environment. It remains to be seen whether the necessarily predictive judgments embodied in the Order will withstand the hard, true test of time. Columbia Broadcasting System, Inc. v. Dem. Nat'l Comm., 412 U.S. at 102, 93 S.Ct. at 2086 ("the broadcast industry is dynamic in terms of technological change; ... [solutions] acceptable today may well be outmoded 10 years hence").
 
 
 152
 In short, it is not at all inconceivable that detailed reconsideration by a future FCC or carefully considered Congressional findings, compare Buckley v. Valeo, 424 U.S. 1, 28, 96 S.Ct. 612, 639, 46 L.Ed.2d 659 (1976) (limitations on campaign contributions focus precisely on problem of corruption and preserve substantial opportunities for political expression) with Fullilove v. Klutznick, 448 U.S. 448, 552, 100 S.Ct. 2758, 2813, 65 L.Ed.2d 902 (1980) (Stevens, J. dissenting) (racial classification not "narrowly tailored" because it "raises too many serious questions that Congress failed to address or answer in a responsible way") and Red Lion, 395 U.S. at 399 n. 26, 89 S.Ct. at 1811 n. 26 (1969) (no specific agency findings needed in light of longstanding Congressional judgment and absence of contrary evidence); could persuade a future court that, notwithstanding the FCC's contrary findings vindicated by today's decision, some in futuro version of the fairness doctrine could be implemented consistent with First Amendment strictures.
 
 C
 
 153
 As to the constitutional principles applicable to this case, the parties are congenially in accord (1) that Red Lion principles govern; and (2) that, under the Red Lion framework, government restrictions on broadcasters' speech are valid only if "narrowly tailored to further a substantial government interest, such as ensuring adequate and balanced coverage of public issues." Order at 5049 (quoting FCC v. League of Women Voters, 468 U.S. at 380, 104 S.Ct. at 3118). It is also by now well recognized that this standard affords broadcasters somewhat less First Amendment protection than that enjoyed by their print media counterparts. Compare Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (content regulation of the print media must be narrowly tailored to serve a compelling government interest).[10]
 
 
 154
 But there consensus abruptly stops. Although the parties agree that Red Lion is king, they strenuously disagree over the proper interpretation of that seminal decision. For its part, the FCC argues that the constitutional question turns on whether enforcement of the fairness doctrine
 
 
 155
 (1) chills speech and results in the net reduction of the presentation of controversial issues of public importance and
 
 
 156
 (2) excessively infringes on the editorial discretion of broadcast journalists and involves unnecessary government intervention to the extent that it is no longer narrowly tailored to meet its objective.
 
 
 157
 Order at 5049. The FCC believes that regulatory intervention through the vehicle of the fairness doctrine is not "narrowly tailored" if the number (and distribution) of media outlets ensures public access to diverse viewpoints. Order at 5051. That is, if access to diverse viewpoints can be achieved without the fairness doctrine, then the doctrine is not "narrowly tailored" because it unnecessarily interferes with editorial decisions. Finally, the FCC interprets Red Lion to render the fairness doctrine unconstitutional if either of these tests (net reduction or not "narrowly tailored") is satisfied. Order at 5052.
 
 
 158
 Petitioners' most vigorous attack is aimed at the proposition that the numerosity of media outlets and intrusive impact of the fairness doctrine may, without more, render the fairness doctrine unconstitutional. Petitioners contend that the relevant concern is the number of media outlets relative to the demand of broadcasters (expressed through license applications) for such outlets. More pertinently, petitioners direct our attention to the unique characteristic of broadcast regulation, namely the potential for interference occasioned by the fact that the broadcast spectrum can physically accommodate only a finite number of users. The potential for signal interference among competing broadcasters, it is argued, necessitates an allocation system whereby regulatory authority assures to broadcasters exclusive use of their portions of the spectrum. As this system by its nature excludes some who wish to broadcast, the readmission of excluded speakers via the fairness doctrine is constitutionally permissible, petitioners maintain, as an adjunct to the licensing system.
 
 
 159
 To recap: as petitioners see it, the fairness doctrine is constitutionally permissible so long as allocational scarcity exists, namely, that demand for broadcast frequencies exceeds supply. See, e.g., Brief for Syracuse Peace Council at 22-27. The FCC, in contrast, asserts that the constitutionality of the doctrine depends on numerical scarcity in the sense that, without government intervention, the public is not provided with access to diverse viewpoints.
 
 
 160
 There is thus a rather pivotal difference in the perspectives vying for judicial approbation. As I see it, the FCC's position is much better founded; indeed, in my view, petitioners have fallen badly into error by misreading Red Lion. There is, to be sure, language in Red Lion with respect to the scarcity of the broadcast spectrum and the consequent tendency toward unrequited demand for frequencies. Red Lion, 395 U.S. at 376, 89 S.Ct. at 1799. Under Red Lion, however, that sort of scarcity seems to constitute a necessary (rather than sufficient) condition of the fairness doctrine's legitimacy. That is, allocational scarcity accounts for the fundamental difference in First Amendment treatment of print and broadcast media. See FCC v. League of Women Voters, 468 U.S. at 377, 104 S.Ct. at 3116 ("[t]he fundamental distinguishing characteristic of the new medium of broadcasting that, in our view, has required some adjustment in First Amendment analysis is that '[b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants.' ") citing Columbia Broadcasting Co. v. Dem. Nat'l Comm., 412 U.S. at 101, 93 S.Ct. at 2086; Red Lion, 395 U.S. at 386, 89 S.Ct. at 1804 ("differences in the characteristics of new media justify differences in the First Amendment standards applied to them"). However, spectrum scarcity, without more, does not necessarily justify regulatory schemes which intrude into First Amendment territory. This point is made clear by the familiar cases in which the Court has upheld broadcast regulation on the ground that the regulation furthered substantial First Amendment interests, see Red Lion, 395 U.S. at 396, 89 S.Ct. at 1809-10; Columbia Broadcasting Co. v. FCC, 453 U.S. 367, 396, 101 S.Ct. 2813, 2830, 69 L.Ed.2d 706 (1981); and by the case of Columbia Broadcasting Co. v. Dem. Nat'l Comm., 412 U.S. at 127-32, 93 S.Ct. at 2098-2101, where the Court held that the FCC need not require licensees to accept all paid political advertisements because such a requirement unduly impinged upon broadcasters' rights and produced little public benefit. In short, petitioners conflate the Supreme Court's choice of a standard for evaluating broadcast regulation with the Court's application of its chosen standard to the interests assertedly advanced by a particular regulatory regime.
 
 
 161
 Petitioners' reliance on the concept of allocational scarcity is logically flawed as well. As part of their attack on numerical scarcity, petitioners contend that "[t]he Red Lion court (sic) did not speak in terms of satiation, or hypothesize a point at which 'enough' diversity is present.... Only when supply and demand [for licenses] reach equipoise does the governmental interest change." Brief of Syracuse Peace Council at 24. The argument is an intriguing one; but I think, with all respect, that it focuses with undue exclusivity on the market for broadcast licenses, whereas the central concern of Red Lion is that the fairness doctrine "preserve an uninhibited marketplace of ideas". Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806. Indeed, a reading of Red Lion yields no evidence that the mere presence of excluded broadcasters is to be regarded as dispositive of the public's need for programming of a particular type. Especially since individual members of the listening or viewing public, such as disappointed broadcast license applicants, may express their viewpoints on controversial issues in any number of ways that do not involve applying for and receiving a broadcasting license, it seems odd (and inaccurate) to equate scarcity in licenses with scarcity in the marketplace of ideas. Indeed, petitioners' argument ultimately flies in the teeth of Red Lion's admonition that "it is the right of viewers and listeners and not that of broadcasters, which is paramount." Red Lion, 395 U.S. at 390, 89 S.Ct. at 1806.[11]
 
 
 162
 In contrast, the FCC has correctly discerned that, under Red Lion, the constitutionality of the fairness doctrine is closely related to the incapacity of the communications marketplace to give expression to diverse voices. As the Court stated, "[i]t is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here." Id. Red Lion teaches that regulation such as the fairness doctrine is constitutionally permissible where, in the absence of regulation, such voices would "by necessity be barred from the airwaves." Id. at 389, 89 S.Ct. at 1806.
 
 
 163
 The governing constitutional doctrine therefore recognizes that the communications marketplace may be sufficiently responsive to the public's need for controversial issue programming so that government regulation is unnecessary. Cf. Red Lion, 395 U.S. at 397, 89 S.Ct. at 1810 (fairness doctrine constitutional in light of the fact that the increased carrying capacity of the broadcast spectrum has been devoted largely to uses unrelated to debate on controversial issues). As a corollary of that principle, the FCC also recognized that, where the communications marketplace itself provides a plethora of voices, the fairness doctrine is not only superfluous, it is positively harmful. This is of singular importance in the analysis. As the Court has stated time and again, regulatory schemes that tread unnecessarily on the editorial discretion of broadcasters contravene the First Amendment. Columbia Broadcasting System, Inc. v. FCC, 453 U.S. at 395, 101 S.Ct. at 2829. ("[T]he broadcasting industry is entitled under the First Amendment to exercise 'the widest journalistic freedom consistent with its public [duties].") quoting Columbia Broadcasting System, Inc. v. Dem. Nat'l Comm., 412 U.S. at 110, 93 S.Ct. at 2090.
 
 
 164
 The Commission is also correct in interpreting the Supreme Court's holdings as rendering the fairness doctrine constitutionally problematic where the "net effect" of the doctrine is a reduction in coverage of controversial public issues. The Supreme Court has expressly indicated that
 
 
 165
 were it to be shown by the Commission that the fairness doctrine "[h]as the net effect of reducing rather than enhancing speech," we would then be forced to reconsider the constitutional basis of our decision in [Red Lion ].
 
 
 166
 FCC v. League of Women Voters, 468 U.S. at 379 n. 12, 104 S.Ct. at 3117 n. 12 (citations omitted). Obviously, as the fairness doctrine exists to promote speech on controversial issues, it seems manifest that the doctrine should not readily enjoy constitutional approbation if it ceases to promote and secure bedrock constitutional interests.
 
 D
 
 167
 As the court's opinion ably demonstrates, the Commission's factual determinations (1) that the growth of broadcast outlets ensures the public's access to viewpoint diversity, and (2) that the fairness doctrine ultimately operates to reduce coverage of controversial issues, find reasonable support in the record. Rather than rehearse the salient points of the record in detail, it suffices for present purposes to highlight several points.
 
 
 168
 Significantly, petitioners do not dispute that, since the late '60s when Red Lion was handed down, the number of media sources has expanded dramatically. The number of full power TV stations has increased 54 percent, Order at 5051, with the result that nearly 96 percent of U.S. households with television received five or more signals. Nearly two thirds of U.S. households received 9 or more signals. 1985 Fairness Report, 102 FCC 2d at 204-05. Similarly, the number of radio stations has increased 57 percent since the first year of the Nixon Administration, when Red Lion was first introduced to the world of constitutional law. Order at 5051. As of 1987, listeners had access to an average of 6 radio stations in the smallest markets and a whopping 25 stations in the largest markets. Brief of FCC at 25. As commuters and Walkman aficionados know, all news-all talk stations (or some variation thereof) abound in large markets.
 
 
 169
 The Commission also took account of the growth of various non-broadcast media, the most important of which is cable television. More than half of the nation's TV households currently subscribe to cable. Id. at 26. The number is growing. Optimists around town say that even District of Columbia residents are beginning to enjoy access to this increasingly universal manifestation of the electronic Agora. And, the proliferation of choice ushered in by cable is staggering. Over 94 percent of cable subscribers receive more than 12 channels; some cable systems have the capacity to offer more than 100 channels. Id. at 27.
 
 
 170
 Petitioners are, nonetheless, unconvinced by all this. They assert that these data fail to support the FCC's pivotal conclusion that "the interest of the public in viewpoint diversity is fully served by the multiplicity of voices in the marketplace today". Order at 5051, quoting 1985 Fairness Report, 102 FCC 2d at 147. They emphasize that the growth in media outlets has not reached many local markets. Brief of Syracuse Peace Council at 28. But, as Judge Williams' opinion for the court persuasively indicates, the data offered by petitioners in this respect fall short of drawing into question the impressive statistics marshalled by the FCC. No more need be said in these already overlong pages on that score.
 
 
 171
 Petitioners also contend that the increase in media sources has not resulted in significant increases in controversial issue programming. They point in particular to FM radio and UHF TV as examples of media sources that have grown rapidly without contributing significantly to viewpoint diversity. The FCC responds that petitioners offer little to back up their opinion-laden allegations. Order at 5051. But, even assuming that UHF TV and FM radio programs are not particularly intensive in their coverage of controversial issues, I am satisfied that the FCC did not put all of its eggs in one part of the large communications-market basket. Rather, as we just saw, the Order points to growth in broadcast media and non-broadcast technologies such as cable and satellite television. Id. The Commission has also indicated that these technologies are contributing to viewpoint diversity. For example, one well-known cable channel, whose chief anchor is blessed with the name of Bernard Shaw, is devoted solely to news; two cable channels are given over to coverage of Congress and related issues. Brief of FCC at 27 n. 25. We are told that the media stand ready and able to enter (and in some instances are entering) the courthouses of this blessed land, if the least dangerous branch decides to opt in favor of glasnost in its own house. In short, inasmuch as the Commission has relied on credible evidence concerning the growth and programming in many types of media, I cannot, in conscience, condemn as arbitrary and capricious its ultimate finding that the communications market as a whole provides "reasonable assurance" of public access to viewpoint diversity.
 
 
 172
 As to the FCC's finding that the fairness doctrine so chilled speech as to result in a net reduction in the coverage of controversial issues, the court quite correctly notes that, where government regulation imposes substantial (and, to a certain extent, unpredictable) consequences on speech, drawing an inference of some chilling effect hardly represents an heroic step in our First Amendment tradition. Maj.Op. at 664. Of greater difficulty is the FCC's finding of a net reduction in controversial issue programming. Petitioners' main argument in this particular is that the Commission gave undue weight to testimony of chilling effect and insufficient weight to evidence that the doctrine stimulated speech.
 
 
 173
 In the face of these arguments, my colleagues state that "[w]e are frankly uncertain how anyone could be sure either way." Id. at 665. Although I agree that the positive and negative impacts of the fairness doctrine cannot be precisely determined, it does not follow that we are justified in upholding the Commission's finding of net reduction on the grounds that "the doctrine's deterrent effects were on the same scale as it expression-generating ones" and that fairness doctrine-induced coverage is to be devalued as "governmentally-coerced speech" fraught with the possibility of partisan abuse. Id. at 665. The first ground seems inappropriate because, in my view, the Commission never made that finding. The second ground is irrelevant because it relates not to the finding of chilling effect, but to the doctrine's impact on distinct First Amendment values such as unfettered editorial discretion.[12]
 
 
 174
 The fact that a reviewing court cannot "be sure" of the correctness of the Commission's finding of net reduction should not lead us to rely on Commission findings that are not germane to the analytically distinct question of the extent to which the fairness doctrine chills speech. In view of the attention given by the Supreme Court to the net reduction issue, FCC v. League of Women Voters, 468 U.S. at 379 n. 12, 104 S.Ct. at 3117 n. 12 (a finding that the fairness doctrine has the net effect of reducing speech would require reconsideration of Red Lion ), and the principle that the interests of broadcasters, while important, are ultimately secondary to those of the viewing and listening public, our review should focus on the evidence adduced by the Commission in favor of its conclusion of a net reduction.
 
 
 175
 In this respect, my reading of the Order suggests that the Commission, based on its regulatory experience and testimony before the agency concerning chilling effects, reasonably determined that the fairness doctrine's predominant effect on speech was inhibitory. Order at 5049. Specifically, the Commission found that the fairness doctrine chilled individual program decisions and induced broadcasters to adopt categorical policies against carrying editorials, political advertisements or nationally-produced public affairs programs. Order at 5050. The Commission further noted that, by virtue of the fairness doctrine, many broadcasters were encouraged not to air controversial issue programming above that minimal amount required by the first part of the doctrine. Id. at 5049. The Commission was also entitled to take into account the fact that the doctrine, by requiring coverage only of "major" contrasting viewpoints, fell with particular severity on broadcasters who express unorthodox views, thus tending to deprive the public of "uninhibited, robust and wide-open" debate. New York Times v. Sullivan, 376 U.S. at 270, 84 S.Ct. at 721. Id. Finally, the Commission pointed to the fact that "no broadcaster indicated to us that its station's coverage of controversial issues has increased as a result of the fairness doctrine." Order at 5050.
 
 
 176
 These findings, taken together, reasonably support the Commission's ultimate conclusion that elimination of the fairness doctrine would unleash a substantial amount of controversial issue programming.[13] In light of our limited scope of review, this factually supported conclusion withstands judicial scrutiny in the absence of powerfully contradictory evidence. Cf. Columbia Broadcasting System v. Dem. Nat'l Comm., 412 U.S. at 122-123, 93 S.Ct. at 2096 ("The Court of Appeals failed to give due weight to the Commission's judgment [that], on balance, the undesirable effects of the right of access urged by respondents would outweigh the asserted benefits"). Petitioners' various arguments to the contrary, although not without force, serve ultimately to underscore the complexity of this issue, but they fail fatally to undermine the FCC's ultimate conclusion.E
 
 
 177
 A final criticism directed at the Order concerns the Commission's decision to eliminate the first part of the fairness doctrine, which requires broadcasters "to cover vitally important controversial issues of interest in their communities". Order at 5058 n. 2. Review of this determination is rendered difficult by the modestly peripheral role that Part One has played throughout the case. As the Commission recognized, "an overwhelming majority of the complaints we receive and virtually all our orders directing licensees to take corrective action ... involve the second prong of the doctrine." Inquiry Concerning Alternatives to the General Fairness Doctrine Obligations of Broadcast Licensees, 2 FCC Rcd Vol. 17 5272, 5289 (1987) ("Alternatives Report") (quoting 1985 Fairness Report, 102 FCC 2d at 161). By the Commission's account, most of the evidence relating to the fairness doctrine's chilling effect and interference with editorial discretion concerned the second part of the doctrine. Indeed, in view of the limited demands placed on licensees by Part One of the fairness doctrine, the FCC expressly disclaimed a finding that, standing alone, the first part of the doctrine would be unconstitutional. Reconsideration Order, 3 FCC Rcd 2035, 2038 (1988).
 
 
 178
 The Commission's policy decision to jettison Part One is explained, in part, by reference to the perceived inseverability of the fairness doctrine's two components. Order at 5048. As the court's opinion convincingly demonstrates, however, the Commission's severability argument is more in the nature of a conclusion than an explanation. Maj.Op. at 668. More plausible is the Commission's contention that, as the first part of the fairness doctrine is "largely duplicative" of the requirement that broadcasters cover issues responsive to the needs of their community, retention of Part One would produce "no added public benefit". Reconsideration Order at 2038. This point is rather unilluminating, however, in light of the Commission's emphasis elsewhere on the distinctions between Part One of the fairness doctrine and the requirement of community issue programming. Brief of Syracuse Peace Council at 48 (the issue responsive standard does not mandate coverage of "controversial public issues of public importance such as require coverage pursuant to the Fairness Doctrine") (quoting Deregulation of Radio, 84 FCC 2d 968, 983 n. 36, recon. denied, 87 FCC 2d 797 (1981), rev'd in part on other grounds, Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1430-32 (D.C.Cir.1983) cert. denied, Black Citizens for a Fair Media v. FCC, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984). Indeed, petitioners point out that the FCC loosened the issue-responsive obligation in part because of a distinct obligation imposed under Part One. Id. at 979. In light of the admitted difference between the two regulatory standards, I am of the view that the Commission's "largely duplicative" rationale is inadequate.
 
 
 179
 Despite these deficiencies, I nonetheless agree that the Commission reasonably eliminated Part One in light of the FCC's findings that the explosive growth in media outlets, combined with the removal of the deterrent to controversial public issue programming imposed by Part Two of the doctrine, will adequately ensure availability of such programs. Reconsideration Order at 2038. The reasonableness of the Commission's decision to eliminate Part One is reinforced by the (inevitably) predictive quality of the FCC's reasoning. It is in this sense that I agree with Judge Williams that the Commission is entitled to conclude that elimination of Part One would not create an impermissible regulatory gap. Maj.Op. at 668. As petitioners have not effectively countered the FCC's findings, the Commission should be permitted, in effect, to experiment with this reform.
 
 
 180
 * * *
 
 
 181
 * * *
 
 
 182
 For the foregoing reasons, I conclude that the FCC's Order in this case should successfully stand in the face of petitioners' onslaught. But in arriving at this destination, I can only end the journey by looking back on the trip and concluding that the Ashwander -inspired detour need not have been taken. Since my colleagues have chosen a very different road map to guide them, I am constrained to concur only in the court's judgment.
 
 
 
 [1]
 Thus the claim of some parties that the Communications Act incorporates a public trustee concept that necessarily includes the fairness doctrine is in essence an effort to ask this panel to overturn TRAC
 
 
 [2]
 The Commission imposes a continuing obligation on licensees to operate "in the public interest" via its power under 47 U.S.C. Sec. 312(b) to issue cease-and-desist orders for failing to operate substantially as set forth in their licenses. The Supreme Court has made clear that the Commission's authority to require continued operation "in the public interest" may be either explicit in the conditions of license issuance or implicit in the FCC's authority under 47 U.S.C. Sec. 312(a)(2) to revoke a license for conditions that would justify denial of an initial license, coupled with the statutory requirement that the public interest be served in granting and renewing licenses, id. at Secs. 307(a) and (d). See Red Lion, 395 U.S. at 372 n. 3, 89 S.Ct. at 1797 n. 3
 
 
 [3]
 In his separate opinion, Judge Starr suggests at 677 that the Commission has "view[ed] the public interest as driven by First Amendment values (when other[s] ... were available)...." The Commission's adoption of that view (if that's what it is) does not seem to us to automatically transform a public interest decision based on such variables into a constitutional decision
 
 
 [4]
 Even if all parties chose to frame the issue as exclusively constitutional, see separate opinion of Judge Starr at 13, these litigation strategies would not establish that the Commission had rested its decision exclusively on constitutional grounds. In any event, while it is true that most parties here seek either to condemn or to vindicate the doctrine on constitutional grounds, not all do. Petitioner Office of Communication of the United Church of Christ squarely attacks the decision as "arbitrary and capricious." See its opening brief at 2, 10, 11, 40, 46. Moreover, in extended passages of their briefs the parties have been content to discuss the Commission's intermediate conclusions, such as those relating to "chill" or the growth of broadcasting outlets, without confining their analysis to constitutional (as opposed to policy) criteria. See, e.g., Brief of Intervenor Meredith Corporation at 17-22 (passage captioned, "The Explosive Growth of Communications Media Renders the Doctrine Unnecessary")
 
 
 [5]
 The exact number of examples in the NAB study is subject to dispute, as the BCFM Comments indicate. That group claimed that the NAB study had some accounts which actually incorporated more than one example, while others which were numbered separately actually referred to the same underlying event. BCFM asserted that, when these discrepancies were accounted for, there were 56 examples. BCFM Reply Comments at 55-56, J.A. Vol. II in Case Nos. 87-1516, 87-1544 at 509-10
 
 
 [6]
 Id. at 172-73 nn. 104-07; id. at 174 n. 109
 
 
 [7]
 It might support an alternative doctrine with more clearly chiselled edges, but no party claims to have presented that alternative in the administrative proceedings. UCC's Brief at 37 n. 43 notes the existence of a draft FCC "primer" on the doctrine, prepared in 1981 but never issued, and suggests that its issuance could have been "highly effective at eliminating misperceptions about the ... doctrine." Having examined the 51-page, singled-spaced document, J.A. (in Nos. 87-1516, 87-1544) at 145-96, we think it far from self-evident that its issuance would have drastically reduced the penumbral chill of the doctrine. Under no circumstances, of course, could it eliminate the non-penumbral chill, i.e., the doctrine's disincentive effects on those who grasped its meaning with perfect accuracy
 
 
 [8]
 UCC claims that the Commission "completely ignored" comments submitted by the Safe Energy Communications Council giving 25 examples of successful uses of the doctrine. UCC Brief at 42. This is flatly untrue. The Commission expressly considered the Council's comments, 2 F.C.C.Rcd. at 5066 n. 139, stating that in light of the evidence gathered in the 1985 Report the Commission remained "convinced that the net effect of the doctrine [was] to inhibit the expression of opinion on important public issues."
 
 
 [9]
 The community issues requirement is set out in Deregulation of Radio, 84 F.C.C.2d 968, 983 n. 36, recon. denied, 87 F.C.C.2d 797 (1981), rev'd in part on other grounds, Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1430-32 (D.C.Cir.1983); Commercial TV Stations, 98 F.C.C.2d 1076, 1092 n. 54 (1984), recon. denied, 104 F.C.C.2d 358 (1986), rev'd in part on other grounds, Action for Children's Television v. FCC, 821 F.2d 741 (D.C.Cir.1987)
 
 
 [1]
 I draw this conclusion from the fact that the Commission itself has identified no party who commented on this issue in response to the Notice of Inquiry. It might be the case that those who responded to the Notice were simply uninterested in the survival of the first prong in the event of the second prong's elimination. That hypothesis, however, is belied by the subsequent history of this litigation. Petitioners have argued forcefully to this court that the first prong should be retained even if the second prong is not. See Brief for Syracuse Peace Council at 40-49; Brief for Geller and Lampert at 36-40
 
 
 [2]
 These arguments, it bears noting, are markedly different from the reasons advanced by the Commission as justification for repeal of the second prong. The FCC has not suggested that the first prong, standing alone, would be unconstitutional. Nor could it plausibly be advanced that a naked obligation to cover controversial issues would by itself chill broadcaster speech
 
 
 [3]
 The Commission has stated that the elimination of the first prong does not cast doubt upon the continued vitality of the community issues requirement. It has explained that "although the first part of the fairness doctrine may overlap with ... the issue responsive programming obligation, we did not intend to suggest that the first part obligation under the fairness doctrine and the duty to air issue responsive programming are identical." Syracuse Peace Council (Reconsideration), 3 F.C.C.Rcd. 2035, 2039 (1988). The FCC's position is that the two requirements are sufficiently similar to make the enforcement of both "duplicative," yet sufficiently different that the elimination of one does not render the other suspect. I do not believe that the agency can have it both ways
 
 
 [4]
 Judge Starr appears to agree on this point. See Starr op. at 687-88
 
 
 [5]
 In State Farm, the Supreme Court noted that "the removal of a regulation may not entail the monetary expenditures and other costs of enacting a new standard, and, accordingly, it may be easier for an agency to justify a deregulatory action." 463 U.S. at 42, 103 S.Ct. at 2866. The Court cautioned, however, that "the direction in which an agency chooses to move does not alter the standard of judicial review established by law." Id
 
 
 [6]
 It might also be that stricter enforcement would make the first prong a potent regulatory tool. The agency has adequately explained its view that stricter enforcement of the first prong would not eliminate the chilling effects produced by prong two. It has also predicted that, with the second prong eliminated, most broadcasters will cover controversial issues without this regulatory spur. It has not, however, adequately considered the possibility that heightened first prong enforcement might be an effective weapon against those few broadcasters who remain recalcitrant. Although my dissent does not turn on the Commission's failure to give proper consideration to this alternative, I believe that failure underscores the too-casual nature of the agency's treatment of this question
 
 
 [1]
 The FCC could not have been more explicit in rejecting the validity of a decision based independently on public interest grounds:
 A meaningful assessment of the propriety of the doctrine, therefore, necessarily includes an evaluation of its constitutionality. If the doctrine impedes the realization of First Amendment objectives ... a fortiori it disserves the public interest.
 Order at 5046.
 
 
 [2]
 Although I rely (necessarily) on the record for this conclusion, I cannot resist noting en passant that both the FCC and attentive Commission watchers have, in other fora, unequivocally viewed the Order as constitutionally driven. See, e.g., Broadcast Deregulation: The Reagan Years and Beyond, 40 Ad.L.Rev. 345 (1988). For example, former FCC Chairman Wiley, a lion of the communications bar, stated that the viability of the public trustee concept "was brought to a head by the FCC's most recent and bold action to abolish as unconstitutional the Fairness Doctrine." Id. at 350. FCC Chairman Patrick, in reply, recognized that "[o]n a narrow constitutional basis, the Commission applied the Red Lion test ... upon that very narrow constitutional ground and test we found [the fairness doctrine] to be unconstitutional." Id. at 356
 
 
 [3]
 In 1987, the FCC so explained the different tone of the 1985 Report:
 We believe, however, as we reiterate today, that our analysis of the fairness doctrine in 1985 was in fact informed and driven by First Amendment principles, and with the uncertainty of the doctrine's codification removed, and the Meredith court's directive to consider the constitutional issues, we believe it is now incumbent upon us to consider the doctrine in terms of the inextricable constitutional issues upon which the policy rests."
 Order at 5062 n. 62 (citations omitted).
 
 
 [4]
 It bears noting that, later in its opinion, the court candidly recognizes that the ultimate conclusion of the 1985 Report was to continue enforcement of the fairness doctrine. Maj.Op. at 666. This fact alone suggests that the Order now under review cannot be read as indiscriminately incorporating the 1985 Report's conclusion
 
 
 [5]
 The court's position is essentially that, because public interest and First Amendment values "overlap," there must be sufficient basis in the Order for affirmance solely on public interest grounds. Maj.Op. at 658-659. The court refuses to recognize that the Order does not contain an "in the alternative" determination that the fairness doctrine contravenes the public interest. Rather, the FCC has engaged in a Red Lion analysis and concluded that, as the fairness doctrine violates the First Amendment, a fortiori it disserves the public interest. It is in this sense that the public interest decision is a tag-along, driven entirely by the constitutional analysis
 
 
 [6]
 As the fairness doctrine itself is not required by statute, Telecommunications Research and Action Center v. FCC, 801 F.2d 501 (D.C.Cir.1986), the Commission's decision to view the public interest in First Amendment terms is subject only to limited review. Specifically, the FCC's position as to the public interest must not be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), and must evince "a rational connection between the facts found and the choice made." Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)
 
 
 [7]
 The cases cited by the majority in its treatment of remand are, in this respect, inapposite. Maj.Op. at 657. For example, Salt River Project Agric. Improvement Power Dist. v. United States, 762 F.2d 1053 (D.C.Cir.1985), involved an agency decision that, because of inadequate or erroneous findings, could not be affirmed as it came to the court. In such a situation, it was unobjectionable for the court to presume that the agency would, on remand, make a corrective finding that was compelled by the evidentiary record. This approach, however, is not justified where, as here, the record squarely presents us with a legitimate (constitutional) basis for decision. Similarly, in Communication Workers of Am. v. NLRB, 784 F.2d 847 (7th Cir.1986), the agency was affirmed based on a ground of decision which the agency had explicitly stated was independent of another (erroneous) ground of decision. Id. at 851. Such an independent ground is simply not present in the Order before us
 
 
 [8]
 The briefs uniformly speak of the FCC's "constitutional" decision under Red Lion. See, e.g., Brief of Geller and Lampert at 1, 3, 5, 6, 15; Brief of SPC at 2, 3-7, 16; Brief of People for the American Way at 2; Brief of United Church of Christ at 41; Brief of Common Cause at 20; Brief of Democratic National Committee at 6. The court finds solace in the fact that some of the briefs do not label the FCC's factual conclusions regarding chilling effect and media growth "constitutional" findings. Maj.Op. at 659-60 n. 4. Yet, the parties universally relate these findings to the Red Lion framework. See, e.g., Brief of Meredith Corp. at 20
 
 
 [9]
 This point undermines the court's conclusion that, under Ashwander v. TVA, 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (Brandeis, J., concurring) (1935), this case must be decided independently on public interest grounds. Most commonly, Ashwander serves to prevent the possibility of judicial invalidation, on constitutional grounds, of the actions (especially legislative enactments) of coordinate branches. Where, as here, the government refuses to regulate (or, more precisely, to continue to regulate) because of perceived constitutional constraints, a judicial decision to uphold or reject the government's position has no such constitutional consequences. As we are called upon to restate the principles articulated in Red Lion and exercise administrative law-type scrutiny over the FCC's factual conclusions, there is no need to get all in a lather about Ashwander principles
 
 
 [10]
 Although the FCC sets forth the view (in other portions of the Order) that Red Lion itself may no longer be viable, the Commission expressly stated that reconsideration of Red Lion lies solely within the province of the Supreme Court (citing Branch v. FCC, 824 F.2d 37 (D.C.Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988)) and that the Order is thus based on a Red Lion analysis. Order at 5065 n. 103. Just so. It should therefore go without saying that the constitutional analysis in this opinion is grounded squarely (and, hopefully, rightly) on Red Lion 's methodological approach
 
 
 [11]
 This defect in petitioners' constitutional argument does not, of course, relieve the FCC of the obligation to support its conclusion that viewpoint diversity exists in the absence of the demands imposed by the fairness doctrine. This point is discussed infra in section D of the opinion
 
 
 [12]
 The Commission's statements regarding "governmentally coerced" speech are not found in the portion of the Order addressed to the fairness doctrine's chilling effect. Order at 5049-50. Rather, coerced speech is examined in connection with the doctrine's impact on editorial discretion, id. at 5050-51, and with the FCC's analysis of the continued viability of different First Amendment standards for print and broadcast media. Order at 5052-57. The latter issue involves sensitive territory which I respectfully decline to explore
 
 
 [13]
 Petitioners claim that, under Red Lion, the proper response to such a chilling effect is more stringent enforcement of part one of the fairness doctrine, which requires reasonable coverage of controversial issues. This contention is based on the statement in Red Lion that "if experience with the administration of these doctrines indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage ... the Commission is not powerless to insist that [broadcasters] give adequate and fair attention to public issues." Red Lion, 395 U.S. at 393, 89 S.Ct. at 1808. In light of the reasonableness of the Commission's findings regarding the growth of media outlets and the fairness doctrine's net negative impact, petitioners' argument should be rejected. Once it is accepted that diverse viewpoints will be available to the public due to the growth of media outlets and the elimination of part two of the fairness doctrine, petitioners' proposed remedy unjustifiably burdens editorial discretion. As the Court stated in Red Lion, "it would be better if the FCC's encouragement were never necessary to induce the broadcasters to meet their responsibility". Id